## THE SAGAPORACK.

### NORFOLK DREDGING CO. v. UNITED STATES.

(Circuit Court of Appeals, Fourth Circuit. April 14, 1925.)

No. 2311.

Collision ⚖➾95(7)—Steamship and tugs with tow of unusual length held equally at fault, and both liable for damages from collision.

Steamship on eastern side of channel, inaugurating port to port signal on sighting tugs with tow of unusual length approaching more than mile ahead on eastern side of channel, and failing to take into consideration time necessary for tugs and tow to cross channel, *held* equally at fault and liable for half of damage from resulting collision.

Woods, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the Eastern District of Virginia, at Norfolk; D. Lawrence Groner, Judge.

Libel by the Norfolk Dredging Company against the United States, owner of the steamship Sagaporack. From a decree for the United States, libelant appeals. Decree modified.

H. H. Little, of Norfolk, Va. (Hughes, Little & Seawell, of Norfolk, Va., on the brief), for appellant.

H. H. Rumble, Sp. Asst. U. S. Atty., of Norfolk, Va. (Paul W. Kear, U. S. Atty., and Charles A. McDonald, Dist. Atty. U. S. Shipping Board, both of Norfolk, Va., on the brief), for the United States.

Before WOODS and WADDILL, Circuit Judges, and McDOWELL, District Judge.

WADDILL, Circuit Judge. The libel in this case was filed under the Suits in Admiralty Act March 9, 1920, 41 Stat. L. 525 (Comp. St. Ann. Supp. 1923, §§ 1251¼–1251¼*l*), to recover damages sustained in a collision between the steamship Sagaporack, a government-owned ship, and a tow of the libelant.

The collision the subject of this litigation occurred on the night of Tuesday, October 30, 1923, about 10:30 o'clock, in the waters of the Elizabeth river, Norfolk Harbor, Va., in the immediate vicinity of the mouth of the cut channel leading from the main channel of the river to the Standard Oil Company property, and about half a mile below Boush Bluff. The facts are substantially as follows:

The libelant, Norfolk Dredging Company, a corporation organized under the laws of the state of Virginia, with its principal place of business in Norfolk, was engaged in the removal of mud from one of the channels of the Elizabeth river near the scene of the collision, and transporting it to the place of deposit in Chesapeake Bay below Willoughby Beach. At the time, it had two tugs and four scows running tandem, which were returning empty from the United States dumping ground aforesaid, having crossed inside Ft. Wool and across the flats to the main channel of the Elizabeth river. The flotilla was 1,230 feet long, and in ascending the river came into collision at the point named with the Sagaporack, a large ocean-going vessel of 5,113 tons burden, 590 feet long, 54.5 feet beam, 27.6 feet deep. The ship was en route from the Government Engineer Pier above Lambert's Point, partly laden, outward bound for Philadelphia, and struck the forward mud-scow of the flotilla, causing serious damage to it, and injuring the second and third scows.

There was a sharp conflict in the testimony as to just how the collision came about, and by whose fault the same was caused, and where it occurred, the libelant's contention being that it was on the western side of the channel, opposite the Standard Oil Company's cut, instead of at the mouth of the cut on the eastern side. Much testimony was introduced, and the District Court was inclined at first to adopt libelant's view. Upon a rehearing and the introduction of additional testimony, the court reached the conclusion that it occurred on the eastern side of the channel, and decided in favor of the respondent and dismissed the libel. From that decision this appeal was taken.

We have given much thought to this case, and are entirely in accord with the findings of the District Judge, that the collision took place on the eastern side of the channel, as claimed by respondent. Indeed, the evidence seems to preclude serious controversy on this subject. But we are not in accord with the District Judge as to what should be the result of this finding.

Libelant's contention is that on coming into the Elizabeth river on its eastern side, and when about opposite Pine Beach, the tow crossed to the westward on a diagonal course, and then proceeded up the channel close to its western edge; that the lights of the Sagaporack above Boush Bluff were observed, and upon the ship's rounding the curve at that point, showed both her red and green lights, and later shut out her green and showed her red light. Shortly after making the turn, a short blast of the whistle was sounded by her, which was answered with one blast by the leading tug. The vessels continued to approach each other until the Sagaporack passed the forward tug at an estimated distance of 150 feet away, when the steamship gave three blasts of her whistle, and instead of continuing down the channel, swung immediately to port, and ran into the front end of the leading scow.

The circumstances of the collision as given by the respondent are directly to the contrary, and substantially as follows: That the steamship, upon coming down the channel, was fully equipped and manned, and in charge of a Virginia pilot and before reaching Boush Bluff saw the tugs and tow, and upon straightening down the channel at Boush Bluff, observed the flotilla dead ahead about a mile distant, coming up the channel. The Sagaporack thereupon blew one blast of her whistle to indicate her desire to pass port to port. The leading tug immediately answered with one blast of its whistle assenting thereto, but did not for some time thereafter change its course to starboard. Upon observing this, the navigators of the steamship Sagaporack put her engines slow, and almost immediately afterwards stopped them. Owing to the delay of the tug in changing its course so as to conform to the passing signals, and to the unmanageable character of the tow, together with the effect of the tide on it, the scows continued to make up the channel on the east side thereof, and directly in the path of the steamship, which was being navigated on the extreme eastern side of the channel; that in this condition the Sagaporack put her engines full speed astern, indicating that fact by three blasts of her whistle, and let her

port anchor go, when the scows came down upon the ship without any slackening of speed.

Concurring, as we do, in the conclusion of the District Judge as to the location of the scene of the collision, it follows that the libelant was at fault in bringing about the same because of its failure to keep to its side of the fairway, and in not proceeding thereto more promptly, after improvidently accepting the port, to port passing signal. But it does not impress us that the libelant should be held entirely at fault and responsible for bringing about the collision, and the respondent escape all liability therefor in the circumstances in which the same occurred here. The tow was of unusual length and character; consisting of two large tugs and four large mud-scows, proceeding directly up the channel on a straight course, on a clear night and with favorable weather conditions. The tugs carried the regulation side lights, bow lights, and three loft lights each, and the scows the regulation lights, a white light on the head end of the head scow, a white light on the tail end of the head scow, and a white light on the tail of every other scow, all brightly burning. The tugs and tow were observed just before the steamship reached Boush Bluff, and after rounding the bluff they were sighted on the eastern side of the channel dead ahead, showing both side lights; and the vessels so navigated for an appreciable time without the tugs going to starboard pursuant to the port to port passage signal, and until it was too late, to avoid collision with the scows. In these circumstances, the steamship slowed down somewhat, and finally stopped, at which time the tugs were still dead ahead when the tugs suddenly veered to the westward side of the channel, leaving the scows right under the bow of the ship about a ship's length away, and her engines were then put full speed astern. The collision was then, however, inevitable.

The ship, inaugurating the port to port signal in meeting a tow of the size and character in question, when the vessels were only about a mile apart, meeting each other head on or nearly so, and with the ship navigating as near to the eastern side of the channel as it prudently could do, so that it could not navigate further to starboard in aid of the passage, was of doubtful propriety, and should not have been resorted to in the absence of some unusual condition making the same necessary; and when in the execution of this maneuver it became manifest that the tug was not conforming to the agreed passage, it was almost reckless negligence for the ship to have continued to navigate with a tow of the length and character in question, coming head on with its running lights not changed until the vessels were virtually within 400 feet, or a ship's length one of the other. The tug and tow were incumbered vessels, and the steamship the free vessel, and the duty imposed upon the latter was to avoid collision or the risk of collision with the former; and while ordinarily the port to port passage is the preferable and generally the usual one for vessels meeting each other, still where there are circumstances, such as in this case, which would make the starboard passage the proper and safer one, it, of course, should be adopted. According to the respondent's entire testimony, the eastern side of the channel, along which it was of right navigating, was observed to be obstructed by a tow of unusual length and character; and there was no reason, considering the distance the vessels were apart and the relation each bore to the other, to hazard the risks of the port to port passage, but on the contrary, under her starboard helm, the steamship should have passed down the ship-channel of 600 feet width, leaving the incumbered tug and tow to the steamer's right. Moreover, under the testimony in this case, and taking into consideration the length of this tow and its character, there was no excuse from the start in the ship inaugurating the port to port passage, as the evidence shows that it would take this tow, proceeding at the usual angle of navigation, nearly half an hour to cross from one side of the channel to the other. The vessels, when the port to port signal was given, were only about a mile apart, each proceeding at about five and a half miles an hour, or approximately a mile in five minutes. For the steamship to have failed to take into account the tailing of the scows, in the effort to cross the channel, was equivalent to running headlong on into a cul-de-sac, from which escape was well-nigh impossible.

Our conclusion is that the collision was the result of fault of both the tugs and the ship, and hence the damages resulting therefrom should be divided.

The decree of the district court will be so modified.

WOODS, Circuit Judge (dissenting). The tugs with their tow were on the wrong side of the channel. The one-blast signal of the steamship Sagaporack was an inquiry addressed to the tugs if they were willing to make the usual port to port passing and if

they could safely do so. Their answer of one blast was an assurance to the steamship that they could and would direct their course to starboard so· as to make the port to port passing safely. The steamship had a right to rely on this assurance until it became· manifest to her navigator that the tugs had given a wrong signal and that they could not ·or would not so navigate as to make the proposed passing safe. I think when this danger became evident the navigator of the steamship did everything possible to prevent the collision in an emergency brought about solely by the fault of the master of the tugs.

For these reasons it seems to me the District Court was right in holding the tugs alone responsible for the collision.