## LA FLANDRE.

## THE PHILADELPHIA.

(Circuit Court of Appeals, Third Circuit. December 7, 1925. Rehearing Denied February 2, 1926.)

No. 3333.

1. **Collision** ⚌122—**Presumption against apportionment of damages, where one boat primarily at fault, unless contributory fault of other established by convincing proof.**

Where primary cause of collision between steamship and pilot boat was fault of pilot boat, presumption of law is against pilot boat, and against apportionment of steamship's damages, unless contributory fault on part of steamship can be established by clear and convincing proof.

2. **Collision** ⚌105—**Evidence held to show pilot boat in fault for collision with steamship, and apportionment of damages to steamship was error.**

Evidence *held* to show that pilot boat, approaching steamship to take off its pilot, was primarily in fault in miscalculating conditions in which she attempted to turn, and that steamer did not, by reversing, change her location and cause pilot boat to strike, and hence apportionment of steamship's damages was error.

3. **Collision** ⚌130—**Interest not allowed on damages recovered, where unwarranted delay in bringing case to conclusion.**

There having been long and unwarranted delay in bringing suit for damages for collision between vessels to a conclusion, no interest will be allowed on the damages recovered.

Appeal from the District Court of the United States for the Eastern District of Pennsylvania; Oliver B. Dickinson, Judge.

Suit for damages resulting from collision by Gustav Claude, late master and part owner of the steamship La Flandre, and as bailee of her cargo, against the steam pilot boat Philadelphia, whereof the Pilots' Association of the Bay and River Delaware is claimant. From a decree finding the steamship La Flandre in fault, and dividing her damages, (239 Fed. 396), the libelant appeals. Remanded, with directions.

Howard M. Long, of Philadelphia, Pa., for appellant.

Lewis, Adler & Laws, of Philadelphia, Pa. (Otto Wolff, Jr., of Philadelphia, Pa., of counsel), for appellee.

Before BUFFINGTON and WOOLLEY, Circuit Judges, and MORRIS, District Judge.

BUFFINGTON, Circuit Judge. In the court below the steamship La Flandre filed a libel against the steam pilot boat Philadelphia for damages resulting from a collision between the two vessels. On final hearing the court found the damages sustained by the steamship were $20,000, that both vessels were in fault, and divided such damages equally. From the decree finding La Flandre in fault, and consequently dividing her damages, that vessel took an appeal. From the decree finding the pilot boat in fault, and assessing $10,000 in damages against it, the latter took no appeal. The contested questions, therefore, before us, are first, Was the steamship in fault; and, secondly, was there error in assessing a part of her own damages upon her.

In point of fact, the steamship itself or her crew was in no fault whatever. She was a passive agent under the control of her pilot, who was a member of the Pilots' Association which owned and operated the pilot boat Philadelphia, which latter collided with the steamship and caused the $20,000 damages here involved. So that we have the anomalous situation of a question of seamanship and differing testimony between two members of the association which owned the striking vessel, and no fault on the part of the vessel, save as caused by the pilot furnished by the association. We refer to these facts only as bearing on the question of the testimony of the two pilots, one of whom is testifying against, and the other in, his own financial interest.

The proofs show the steamship La Flandre, outward bound, reached the Delaware Capes about 2:30, in charge of Pilot Messick, who signaled the pilot boat of his association to take him off. The day was clear, the wind light, and no reason existed why the pilot boat could not have taken him off with safety to both vessels. In response to Pilot Messick's signal, the pilot boat, which was on La Flandre's port bow, but practically dead ahead, started, and the steamer's course was at once changed to make the pilot boat bear off the steamer's starboard bow, and thus enable the latter's pilot to leave her on the lee side. The pilot's ladder was slung on that side, and Messick, the pilot, gave orders which were followed: 2:10, slow down; 2:18 order to stop; 2:22, full speed astern; and almost at once (entered as of 2:23), stop.

The expectation of Pilot Messick was that the pilot boat would come around the steamer's stern and take him off on the lee side. Instead of doing so, John H. H. Kelly, the pilot of the Philadelphia, determined to swing around, on a sharper curve, and take the pilot off on the starboard side, with the

result that the Philadelphia struck La Flandre and caused the damage noted. In that regard the court below found and held: "The pilot boat is found in fault in miscalculating the conditions under which she attempted to make the turn, so as to come around on the starboard side of the steamer, and the collision and consequent damage were primarily due to this." This finding, unchallenged by appeal of the Philadelphia, as we have seen, we agree with.

The proofs show that Kelly, the pilot of the Philadelphia, had been called from sleep to take charge of her in making the maneuver. In what respect he does not say it would have been better, but he testified himself[1] that it would have been better if he had had more time; that he had no idea, until the Philadelphia was half her length away from the La Flandre, that there might be a collision; and that Pilot Messick was not to blame, and he himself was. In that regard his testimony was:

"Q. As a matter of fact, it was not until the vessels were about half a length of the pilot boat away that you anticipated there would be a collision; that is right, is it not? A. Yes.

"Q. Then you saw the collision was going to happen? A. Yes.

"Q. Before that time you had no anxiety as to a collision? A. No; not as to a collision.

"Q. When you testified before the inspectors, you were asked if you blamed Mr. Messick for this collision? A. Yes.

"Q. You said you did not? A. Yes.

"Q. You said what you did blame was yourself? A. Yes.

"Q. Because you felt you could have been far enough away from that steamship, so that her backing would not have made any difference? A. Yes.

"Q. That is what you said in the investigation, and that is what you say now? A. That is what I felt at that time; yes.

"Q. That is what you said? A. That is what I said."

[1, 2] Finding, then, as we do that the primary cause of this collision was the fault of the pilot boat, it follows that, to sustain the apportionment of the steamship's damages between it and the pilot boat, the presumption of the law is against the pilot boat, and against apportionment, unless that vessel can, by clear and convincing proof, establish contributory fault on the part of the steamer.[2]

To fix such fault on the steamer, the pilot of the Philadelphia contends that the steamer reversed, and thereby unexpectedly threw its bow to starboard, and into the path of the Philadelphia. If such had been the fact, we naturally ask ourselves why Kelly, her pilot, testified before the inspectors that he, and not Messick, the other pilot, was in fault. In and of itself, that testimony, given immediately after the occurrence, made in criticism of himself, and given against his own interest, so strongly justifies its own truth as not to be set aside without countervailing proof, and when such countervailing proof comes from a change of testimony later on, we find weight in the original, rather than the later, statement. And this conclusion we find supported by other proof. The testimony of Pilot Messick was that the propeller was in reverse for so short a time it had no effect on the course, and that it did not and could not have swung to starboard the bow of a heavily laden steamer moving only a knot an hour; moreover, the supporting testimony of members of the crew and witnesses called to support Messick's view constitute, in our view, weightier proof than those called to support Pilot Kelly's contention, in that Lannaer, the third officer of the steamer, and who was on the bridge, testified that the steamer was headed south-southeast when the last order to stop was given; that they "had hardly started to put the engine astern before we again got the order, 'stop'"; that when the collision occurred he went to the compass, and she was heading south-southeast. He testified that, when the order of full speed astern was given, the steamer was moving ahead between a quarter and a half mile an hour.

The testimony of Stenger, licensed second mate, is to the same effect. The testimony of Claude, the steamer's master, is to the same effect, and is clear and convincing—that the steamer's course was not changed, and that the order for full speed astern was followed almost immediately by the order to stop. He was familiar with the handling of his steamer and knew how she responded; he and indeed the other officers were in place,

---

[1] "Q. You think, with this vessel one-eighth of a mile away, and your boat proceeding toward her at the rate of 6 or 7 knots an hour, and you called out of a sleep to take charge of your boat—you think you have plenty of time to get your wits about you? A. Yes.

"Q. If you had had more time, it would have been better, though, wouldn't it? A. Yes."

[2] The Victory and The Plymothian, 168 U. S. 410, 18 S. Ct. 149, 42 L. Ed. 519; City of New York, 147 U. S. 72, 13 S. Ct. 211, 37 L. Ed. 84; The Oregon, 158 U. S. 186, 15 S. Ct. 804, 39 L. Ed. 943.

ready to resume charge of the ship where Pilot Messick left off, and knowing, as he did, the movement of the ship, the time the full speed astern order was acted on, and familiar as he was with the usual response of his own ship, his testimony,[3] quoted in the margin, that the full speed astern order did not change the course of the ship, carries a weight and conviction not to be given to the testimony of the witnesses who had no knowledge of the ship's response to orders, and whose testimony was in answer to a hypothetical question.

We have not overlooked the strongly urged contention that the steamship's movements and the relative positions of the two vessels could not have been such as the steamship contended, by reason of the angle at which the pilot boat struck the steamer; but, notwithstanding this contention, we are satisfied that, whatever the angle the instant of the blow, that blow and its angle were caused by the fault of the pilot boat in miscalculating the conditions under which she attempted to turn, and that steamer did not change her location and cause the pilot boat to strike.

Finding, then, the pilot boat in fault, as we do, and holding, further, that she has not, by clear and convincing proof, established contributory fault on the part of the steamer, we hold the court erred in proportioning the damages. We therefore remand the case to the court below, with directions to amend its decree by adjudging the steamer free of fault, the pilot boat in fault, and by now assessing the total damage against the pilot boat.

[3] In this case there has been long and unwarranted delay in bringing it to a conclusion, and we therefore hold that no interest whatever on the damages be allowed by the court below, when entering its amended decree.

---

[3] "Q. I understood you to say that the order was given to 'slow down' the engines? A. Yes, sir; that was the first order given after the order to 'stand by.'

"Q. And then the next was 'stop'? A. Yes, sir.

"Q. But you had continued under the order of 'slow' for some time before the order to 'stop'? A. Yes, sir; maybe eight minutes, or something like that; I don't know exactly.

"Q. Now, what do you say was the next order that was given concerning your engines? A. The next order that was given after that was 'full speed astern.'

"Q. That order, you have testified, was given by the pilot, in order to stop what headway that she had? A. Yes, sir; he said that he thought that she had too much headway, but he must have been mistaken in that, because he gave the order to 'stop' right away again.

"Q. But she did have some headway at the time the order to go 'full speed astern' was given? A. She was almost stopped dead in the water then, because the order to go 'full speed astern' did not have any effect; it was changed so quick.

"Q. But you don't know how much headway that she had at the time that the order to go 'full speed astern' was given? A. I know that she had hardly any headway at all when that order was given.

"Q. How were you able to tell whether or not she had any headway then? A. Because, in looking over the side, I saw that she had very little headway, and I made a remark that we did not have to go 'full speed astern,' because she did not have any headway to speak of, and right away the pilot changed it himself again to 'stop.' I took the engineer's statement that it was only about a minute that he had the engines running 'full speed astern.' If she had had any headway, it would have taken five minutes to stop her.

"Q. Is your vessel a right-hander propeller? A. Yes. sir.

"Q. So that, when your engines are reversed, it throws the bow of the vessel which way? A. When you reverse the engines, it will throw the bow to starboard.

"Q. And throwing the bow to starboard threw it towards the pilot boat? A. It would, if the vessel was going astern for any length of time.

"Q. In this case, did it not have the tendency of throwing the bow of your vessel to starboard? A. No, sir; not in this case, because we were going 'full speed astern' not for more than a minute, if that long, and it would take five minutes before it would have any effect at all upon the heading of the steamer.

"Q. But you did not look in the compass to see whether or not her heading had been changed? A. Yes, sir; I looked at the compass, and I saw that it had not changed.

"Q. When was it that you looked at the compass to see about the heading of your steamer? A. When I came on the bridge, she was heading south-southeast, and right after the collision had happened I wanted to go and look at the damage, and I then looked at the compass, and I saw that she was heading south-southeast still.

"Q. But the first time, when you came on the bridge, you did not look at the compass? A. No, sir; but the third officer told me how she was heading then.

"Q. And you say that you looked at the compass right after the collision? A. Yes, sir.

"Q. And it was then south-southeast? A. Yes, sir; it was.

"Q. Now, had you looked at the compass at any other time than that? A. Only when I went to the bridge.

"Q. Did you look at it then? A. Yes, sir; I did."