## THE AMBRIDGE.
## THE WILLSOLO.

**UNITED STATES v. WILLIAMS S. S. CO., Inc.**

No. 2985.

Circuit Court of Appeals, Fourth Circuit.

June 10, 1930.

H. H. Rumble, Sp. Asst. to Atty. Gen. (Paul W. Kear, U. S. Atty., of Norfolk, Va., on the brief), for appellant.

Henry H. Little, of Norfolk, Va. (Hughes, Little & Seawell, of Norfolk, Va., on the brief), for appellee.

Before NORTHCOTT, Circuit Judge, and BAKER and COLEMAN, District Judges.

WILLIAM C. COLEMAN, District Judge.

This is an appeal from a decree of the District Court of the United States for the Eastern District of Virginia, in admiralty, whereby the United States, as owner of the steamship Ambridge, was held liable for damages in a collision with the steamship Willsolo, belonging to the Williams Steamship Company, Incorporated, which occurred in

the Elizabeth river channel, Norfolk Harbor, in the late afternoon of January 10, 1929. There were two suits which were consolidated and heard together; the first an action in rem, brought by the United States against the Willsolo, and the second, an action in personam brought by the Williams Steamship Company against the United States. The District Court found the collision to be due solely to the fault of the Ambridge, entered a decree to that effect, the damages subsequently to be ascertained, and dismissed the libel of the United States against the Willsolo.

The following material facts are either not disputed, or are clearly established by the weight of the evidence. On the afternoon of January 10, 1929, the Ambridge, a steel vessel of 6,631 gross tons, length 395.5 feet, beam 55 feet, draught 31 feet, was proceeding up the channel bound in from Philadelphia to the Army Base piers at Norfolk. She was only partly loaded with a mean draught of approximately 16 feet. The Willsolo, also a steel vessel of 5,816 gross tons, length 450 feet, beam 57 feet, draught 27 feet, was proceeding, heavily laden, outbound for Philadelphia. The weather was clear, with a moderate south southwest wind and a flood tide. The channel of the Elizabeth river where the vessels were proceeding is dredged to a width of 600 feet for deep draught vessels, and is defined, in accordance with the established channel regulations, by a series of can and spar buoys, black, with odd numbers, on the eastern side, and red, with even numbers, on the western side of the channel. As the Ambridge reached a point opposite the Army Base, she blew four whistles as a signal for a tug at that place to take charge of docking her. Receiving no reply, her engines were slowed down, then stopped, and she proceeded, drifting under her own way, up the west side of the channel until between spar buoy 12 and gas buoy 12a, when, observing that the tug was docking another vessel at the Army Base, the pilot of the Ambridge put the vessel's engines in reverse in order to hold her position while awaiting the tug. Thereupon, in order to avoid striking gas buoy 12a, her engines were put half ahead and her helm hard to starboard. The effect of this was, as intended, to swing her head to port and as soon as she had cleared the buoy, her helm was put hard aport in order to bring her head back again to the westward. While the Ambridge was thus swinging in order to avoid a collision with the buoy, the Willsolo was about one-half mile distant, approaching at full speed, between eight and nine knots, and she blew one blast of her whistle, indicating a

port to port passing, which signal was immediately accepted by the Ambridge with one blast. Finding that the Ambridge was answering her helm slowly, in order to accelerate the swing of her head westward so as to insure clearing buoy 12a, which was passed within five or ten feet, her engines were put full speed astern, which fact was indicated to the Willsolo by three short blasts of the Ambridge's whistle. Almost immediately thereafter the Willsolo herself gave three blasts, indicating full speed astern (order for which, according to her bell book, followed immediately upon an order for half speed ahead), and sheered rapidly westward toward the Ambridge, whereupon she, the Willsolo, dropped her starboard anchor in an effort to stop the sheer, but she continued to swing and struck the Ambridge with her port bow about 15 or 20 feet abaft the Ambridge's stem, port side, at an angle of approximately 45 degrees, the impact, which was heavy, making large holes above the water line in both vessels. The time between the exchange of passing signals and the three-blast signal of the Ambridge was one and one-half or two minutes; between the latter signal, which was followed almost immediately by the three-blast signal of the Willsolo, and the collision, about two minutes.

On behalf of the Ambridge it is claimed that, whereas she was at all times, until after the collision, on her proper side, the Willsolo, without justification, sheered to port, crossing from the east to the west side of the channel. On the other hand, on behalf of the Willsolo, it is claimed that she kept to her own side, and that the collision was due to the fact that the Ambridge violated the rule of the road in not keeping to her own side and thus insuring a safe port to port passing. Pilot Rules, article 18, rule 1 (33 USCA § 203).

The District Court, in finding the Ambridge solely at fault, based its conclusion primarily on the fact that it found the Ambridge had negligently lost proper steerageway while waiting for the tug to pick her up, by reason of which she was not under proper control and got out of her proper position in the channel, which rendered it necessary for her to reverse her engines in order to get her head over so that she could resume her proper position; that such sheer as the Willsolo may have taken was the result of an entirely reasonable effort on the part of her master to avoid a collision with the Ambridge by pressing over as far as he could on the starboard side of the channel, by reversing his engines, and by the use of the starboard anchor; and

that the Ambridge, after an exchange of signals for a port to port passage, had improperly swung her stern in such a manner as to render impossible the accomplishment of the intended maneuver. The lower court rejected as improbable the theory advanced on behalf of the Ambridge, that before the Willsolo sounded her three-blast signal she had felt the effect of the suction or bank wave created by her alleged excessive speed; that is, the theory that her "smelling" the bank had created the sheer which caused her to collide with the Ambridge. The reasoning of the District Judge is succinctly summarized by the following statement at the close of his opinion: "I do not maintain that the question whether this vessel (the Willsolo) sheered as she smelt the bank and so changed her course is not in doubt. I think though, the greater weight of the evidence is that the collision actually occurred on the eastern side of the channel. * * * Whether it (the Willsolo's position) was a result of sheer or whether it was the result of a movement of her helm, I don't know. But all the facts and circumstances convince me that this collision would not have occurred except for the negligence or misfortune of the Ambridge in being where she was not intended to be."

On appeal, counsel for the Ambridge stressed the point that, even assuming the District Court was correct in finding that she was at fault, a finding of mutual fault is equally inescapable because, as was asserted, what the Ambridge did was not so instantaneous as to have prevented the Willsolo herself from avoiding the collision; that is to say, the argument of mutual fault is based upon the theory that it was incumbent upon the Willsolo to reduce her speed, instead of which, after passing signals were exchanged, and after it was apparent that the Ambridge continued to swing across the channel in the path of the Willsolo, the latter nevertheless continued to run full speed ahead into a situation of obvious danger until one minute before the impact, when she reversed her engines, which was too late to avoid the collision; there then being scarcely more than her own length of open water between her and the Ambridge.

We have no hesitancy in agreeing with the lower court that the Ambridge was at fault, and that such was the primary cause of the collision, because, making all due allowance for the conflict in the evidence with respect to whether or not by loss of proper steerageway she was out of control, and also as to how far her stern had swung across the

channel, the fact remains uncontradicted that the reduction in her speed had already put her in a precarious condition with respect to the buoy, in avoiding which she was forced to alter her course to the eastward, from which change, by reason of her reduced speed, she was not able to recover with sufficient promptness to enable her to fulfill her own duty in the port to port passing to which she had agreed. She was not in a position safely to acquiesce in such maneuver without ringing up her engines. It was not negligent per se for her to reduce her speed and then to stop her engines in the first instance, in order to wait, as she did, for her tug, but it was negligent for her to make this election and thereupon, before gaining steerageway, to invite the passing of another vessel.

The following testimony of the Ambridge's pilot permits of no other conclusion: "I reversed the engine of the Ambridge in order to hold her in a position to the northward of the entrance to the Army Base, knowing that I would have to wait. In doing this, this canted her head to the westward to the starboard in the proper manner and by this maneuver the Ambridge was swinging, as I said, to the westward and was approaching gas buoy No. 12A to such a point that I had to starboard my helm to avoid striking the buoy. The helm of the Ambridge was put hard astarboard and the engine half ahead, to avoid striking this gas buoy No. 12A, and as the gas buoy passed abeam within five or ten feet of the ship the helm of the Ambridge was put hard aport, but as the vessel maneuvered to the eastward to avoid striking the buoy this time the Willsolo was coming around Bush's Bluff apparently in the middle of the channel, swinging on port and blew one blast which was immediately answered by the Ambridge. And the Ambridge's engines were put full astern to accelerate the movement. She was under her port helm to accelerate the swing to the starboard, to the westward. The Ambridge at that time was still on the west side of the channel. Her engines were worked astern not over a minute. Working the engines astern accelerated the swing to the starboard. The ship did not at any time get stern way. She was never dead in the water. Not until after the collision was she ever dead in the water. As the engines of the Ambridge were reversed I blew three short blasts. Then the engines of the Ambridge were put full ahead, hard aport helm, which would still swing her to the westward, and shortly afterwards three short whistles were blown by the

Willsolo which was at this time approaching very quickly. And shortly after the three whistles that the Willsolo blew there was noticed a distinct sheer to port of the Willsolo. A sheer to her port would be a sheer to the westward and the Ambridge's engines were reversed again and put full ahead again, still with a hard aport helm. And after noticing this sheer was decided and he was backing, the Ambridge's engines were finally put full astern and left astern until after the collision. When I blew my backing signals the Ambridge was not as far east as mid channel. She was just clearing this buoy on the west side. She cleared that buoy from five to ten feet; not any more. Almost struck it."

To the same effect is the following statement of the master of the Ambridge: "We were idling, waiting for the towboat. *As we got up to the gas buoy at 12-A, we made it too close on our starboard hand and had to cast the ship towards the center of the channel in order to get around it,* and at about the time we were doing that we noticed a ship coming down, bound out, a heavy loaded ship, which later proved to be the Willsolo. He had not made Bush Bluff, which is the entrance to the Army Base. There is a little bend in the channel there, at Bush Bluff. He blew us one whistle, which we answered with one whistle. And as we were maneuvering around this buoy we went astern on our engines to help cast her head back to westward, which she was headed a little bit across the channel, and blew him three whistles to signify we were going full astern on our engines. We only did that for a few seconds, just enough to start her swinging faster, and then went ahead again, swinging westward. A few seconds later the Willsolo blew three whistles, and very shortly after that we noticed, a very few seconds later, she started to sheer—the Willsolo, towards the center of the channel and at the Ambridge. By this time we had stopped from going astern and were going ahead again, and when I saw the Willsolo sheer at us I immediately went full speed astern and kept my engines on full astern until after the two ships collided. I should say it was twenty to thirty seconds, maybe not much more than that, after I observed the Willsolo sheering to the westward before she came into my ship. My ship was to the westward of the center of the channel, but near the center. * * * *I had to go astern on my vessel to help swing her bow to starboard faster after that exchange of signals in order to keep on my side of the channel."* (Italics inserted.)

All of this testimony is confirmed by the following entries in the Ambridge's logbook: "5:11 p. m., full astern, Stop. 5:11½, half ahead. 5:12 p. m., stop. Full astern. 5:13, stop. Full ahead. 5:14 p. m., full astern. 5:15 p. m., full ahead. 5:15 p. m., full astern, and collided with SS Willsolo." And in her bellbook, in reading which it is to be noted that the Ambridge's engine room clock was set one minute ahead of her bridge clock: "Stop 5:12. Full astern 5:12. Stop 5:13. Half ahead 5:13½. Full astern 5:14. Full ahead 5:15. Full astern 5:15. Full ahead 5:16. Full astern 5:16."

There still remains, however, the question as to whether or not both vessels were at fault; that is to say, whether or not the Willsolo was herself negligent in failing sooner to reduce her speed when she saw, as she did from the time passing signals were exchanged, that the Ambridge was slow in "straightening up." In other words, the argument on behalf of the Ambridge is that the Willsolo in effect ran her down, although the Willsolo might have avoided the collision, if not altogether, then at least lessened the force of the impact with a consequent reduction of damage to both vessels.

■ We are not impressed with this argument. The Willsolo, while on her own proper side of the channel, had given a proper passing signal to the Ambridge which the latter had accepted, thereby giving the Willsolo to understand, in spite of the Ambridge's then position and movements, that she was able to, and would, so alter her course as to effect the agreed passing. Under these conditions it was reasonable for the master of the Willsolo to assume that the Ambridge not only could, but would, accomplish her part, which meant that the master of the Willsolo had a right to continue on his way without change of course or speed until he received distinct warning that the Ambridge was *in fact* unable to do what she had agreed to do which, as appears from the weight of the evidence, he did not receive until the Ambridge's reverse signal, upon receipt of which the master of the Willsolo immediately reversed his own engines and dropped his anchor. This conclusion is justified, we feel, by the testimony of the master of the Willsolo to the effect that, "at the time I blew him one whistle, was 5:12—this is my memory, the logbook will tell you whether I am right— and he answered with one whistle, signifying all clear. Still his ship kept coming across the channel. Apparently *they were doing their best to straighten her up, getting her to*

*head up the channel.* Finally they got her head around, apparently southwest so that his port bow was towards me but his stern was over the east side of the channel—over the cut—so that the stern was outside of the line of buoys on the eastern side of the channel. It was then that he blew me three whistles, signifying he was backing his ship which had a tendency to keep her in that position, which was dead ahead of my vessel. *I suppose the vessels were two shiplengths apart at that time.* Upon getting his signal of three blasts I immediately reversed my engine full speed astern—nothing else I could do—blew three whistles and dropped my starboard anchor. *The Ambridge did not blow a backing signal at the time her engines were first put astern.* I observed she was going astern on her engines at the time I saw her heading to the eastward—apparently she was backing but still she was quite a distance from me, and I couldn't swear to this, but I was going entirely by the appearance of the water under her stern, she being a light ship, part of her propeller was out of water, on the surface, and white water was forming around her counter, showing she was backing." (Italics inserted.)

Little need be said about the sheering of the Willsolo, because, assuming that it did occur as described by the witnesses for the Ambridge, nevertheless we agree with the lower court that it cannot be ascribed to any fault on the part of the Willsolo for which she is chargeable. In all likelihood such sheer as occurred was due to the stern movement of the Willsolo in her efforts to avoid a collision, a measure which was the only one to adopt in the emergency for which the Willsolo was not responsible, albeit it did not accomplish its full purpose. The correctness of this conclusion is borne out by the fact that the very decided weight of the evidence indicates that there was no sheer until *after* the Willsolo gave her reverse signal. The master of the Ambridge, her chief officer, second and third officers, and helmsman, all so testified, and the chief and second officer of the Willsolo testified there was no sheer until after the collision.

Appellant claims that the present situation as respects mutuality of fault is within the ruling laid down in The Sagaporack (C. C. A.) 5 F.(2d) 178 and La Lorraine (C. C. A.) 12 F.(2d) 436, but with this we cannot agree. In the first of these cases, a steamer outbound from Norfolk, having given to and received from a tug a signal for a port to port passing, continued on her course notwithstanding the fact that the approaching tug was seen to be keeping her course without doing anything to comply with the passing agreement until she was within a length away, and notwithstanding the fact that she saw the tug had a long tow which, in a flood tide, was tailing across the steamer's course. The distinction between this case and the present one is evidenced by the fact that towage was involved, not to mention other differences equally manifest.

Similarly, in La Lorraine the facts are quite different from those in the present case. La Lorraine, having straightened on her course going out of New York harbor, observed another steamer backing out into the stream toward her, blowing three-blast signals. La Lorraine nevertheless continued her course, blowing two-blast signals until the other steamer, having the room which she desired in order to make her turn, went ahead on her course, but it was then too late for La Lorraine to avoid collision. The facts in this case constitute it one of special circumstances, contrary to the present situation, because the vessel with which La Lorraine collided was not, as was the Ambridge, on a distinct course, but was maneuvering out from her dock preparatory to commencing her course.

Counsel for the Ambridge would have us conclude that the master of the Willsolo must have known the Ambridge was out of proper control when she answered the passing signal, because of the fact that he said "apparently they were doing their best to straighten her up" at that time. In this we cannot concur, because from the then position of his own vessel, and the width of the channel, the master of the Willsolo was justified in maintaining his course and speed until reasonably satisfied as to the success or failure of what was apparent to him. The danger was not so imminent as to warrant our saying that the master of the Willsolo had *no* discretion whatsoever, no choice of action. This is borne out by the fact that at least one minute elapsed between the time he reversed his engines and the collision. The master and pilot of the Ambridge testified that the three-blast signal of the Willsolo did not follow immediately after the three blasts from the Ambridge. The former stated that it was heard shortly after the Ambridge had been put full ahead and the latter a few seconds thereafter. The master of the Willsolo testified that upon receiving the three-blast signal from the Ambridge he immediately went full speed astern and blew three whistles. It is further to be noted that the mas-

ter of the Willsolo also testified that the Ambridge did not blow her three blasts as soon as her engines were reversed. The bellbook of the Ambridge bears out this statement, because it is claimed on behalf of the Ambridge that about two minutes elapsed between the giving of her three-blast signal and the collision, whereas her bellbook shows that she went full speed astern as much as four minutes before the collision. This record, therefore, is of particular significance as corroborating what the master of the Willsolo said and that the Ambridge was unjustifiably dilatory in informing the Willsolo of her engine movements. Granting that, independently of signals, the Willsolo's master could see what was taking place, he is not to be charged with the same knowledge of the Ambridge's exact movements and difficulties as are those on board of her. She was the burdened vessel. Subsequent knowledge of how one might have avoided a disaster should not be taken as an unqualified test of whether there was a prior duty to avoid it. Where, as here, the fault of one vessel is clearly established, the evidence of the other vessel's fault must also be clear and convincing in order to make out a case for apportionment of damage. This principle has been repeatedly announced by the Supreme Court. The City of New York, 147 U. S. 72, 13 S. Ct. 211, 37 L. Ed. 84; The Ludvig Holberg, 157 U. S. 60, 15 S. Ct. 477, 39 L. Ed. 620; The Umbria, 166 U. S. 404, 17 S. Ct. 610, 41 L. Ed. 1053; The Victory, 168 U. S. 410, 18 S. Ct. 149, 42 L. Ed. 519. See, also, M. & J. Tracy v. Cattaneo (C. C. A.) 15 F.(2d) 684; La Flandre (C. C. A.) 9 F.(2d) 331; The Yoshida Maru No. 1 (C. C. A.) 20 F.(2d) 25.

■■ A decision of a trial court in admiralty upon a question of fact, based upon conflicting testimony and the credibility of witnesses examined before the trial judge, is entitled to great respect, and will not be reversed on appeal unless the evidence clearly demonstrates that the decision was erroneous. The Ludvig Holberg, supra; Southern Towing Co. v. Egan (C. C. A.) 184 F. 275; Dempsey v. Eastern Transportation Co. (C. C. A.) 275 F. 350; The City of Baltimore (C. C. A.) 282 F. 490; Robert B. Wathen v. Westmoreland Coal Co., 40 F.(2d) 47. We are not, however, unmindful of the further rule that, if the testimony has not been taken before the trial judge, his decision on questions of fact is not entitled to the same controlling weight as in cases where he saw and heard the witnesses testify. The Kalfarli (C. C. A.).277 F. 391; Pendleton Bros. v. Morgan

(C. C. A.) 11 F.(2d) 67; The Yoshida Maru No. 1, supra. Counsel for the government have stressed this latter principle because of the fact that of the twenty-one witnesses in the present case, seventeen, comprising various members of the crews of both vessels, testified not in open court, but by deposition. Of the four persons who did testify in open court, only one, namely, the pilot of the Ambridge, was on either vessel. In short, the government claims that there can be no presumption in the present case in favor of the findings of fact by the lower court. Assuming this to be true, we have carefully examined the entire testimony, and as a result of such examination have reached the same conclusion as did the trial judge.

The decree of the court below is accordingly affirmed.