Maurice F. WALKER, an Individual,
Plaintiff,

v.

SABINE TOWING AND TRANSPOR-
TATION CO., INC., a corporation, in
personam, and the TUG BOAZ in rem,
Defendants.

Civ. A. No. 74–237–T.

United States District Court,
S. D. Alabama, S. D.

Aug. 11, 1975.

G. Hamp Uzzelle, III, Mobile, Ala.,
for plaintiff.

Rae M. Crowe and Geoffrey V. Park-
er, Mobile, Ala., for defendants.

## FINDINGS OF FACT AND CON-CLUSIONS OF LAW

DANIEL HOLCOMBE THOMAS,
Senior District Judge.

This cause came on to be heard before
the Court on the 23rd and 24th days of
June, 1975.

The Court, after examining the
pleadings and the evidence presented at
the trial of this cause on the dates
aforesaid, makes the following findings
of fact and conclusions of law involved
in the collision of the vessel GULF
STREAM, owned by the plaintiff,
Maurice Walker, and the lead barge of
the 2-barge tow of the tug BOAZ, owned
by the defendant, Sabine Towing &
Transportation Co., Inc.

### FINDINGS OF FACT

1. Plaintiff, Walker, is and was, at
all material times, an individual resi-
dent of the State of Florida and the
owner of the F/V GULF STREAM.

2. Defendant, Sabine, is and was,
at all material times, a corporation or-

ganized and existing under and by virtue of the laws of the State of Delaware, having it principal place of business in Groves, Texas, and was and still is, the owner of the tug BOAZ.

3. The GULF STREAM and the lead barge in the tow of the BOAZ were in collision in the Intracoastal Waterway in Bon Secour Bay, Alabama, on January 12, 1974.

4. On January 12, 1974, the BOAZ, pushing two loaded gasoline barges, the CHEVRON 31 and the CHEVRON 32, was proceeding east in the Intracoastal Waterway in Bon Secour Bay. The CHEVRON 31 is 50 feet wide and 240 feet long, and the CHEVRON 32 is 150 feet long and 50 feet wide. Both barges in their loaded condition had a draft of approximately 9 feet. The BOAZ is 28 feet wide and 71 feet long, and has a draft of 8½ feet on the bow and 7 feet on the stern. The GULF STREAM was 18 feet wide and approximately 72 feet long, having a draft of 8 feet, 6 inches.

5. At the time of the collision, the weather was clear and the visibility was at least 8 miles. Winds were out of the northeast at approximately 15–20 miles an hour. Seas were running approximately 1½ to 2 feet from the northeast.

6. The Intracoastal Waterway in Bon Secour Bay is maintained by the Corps of Engineers at a dredged depth of 12 feet and a width of 125 feet. There is a line of red buoys north of the channel and a line of black cans south of the channel. The distance between these 2 lines of navigational aids is approximately 300 feet and vessels of a 9-foot draft could navigate throughout the 300-foot area on January 12, 1974.

7. After entering the Intracoastal Waterway at buoy 209, the BOAZ and her tow maintained an easterly course in the middle of the channel. The GULF STREAM, for quite some time prior to the accident, maintained a westerly course in the south part of the channel approximately 50 feet from the line of black cans. At a distance of approximately 1½ miles, the BOAZ directed her course to the north side of the channel and navigated easterly approximately 50 feet from the red buoy line. When the east-west difference between the bow of the GULF STREAM and the lead barge of the BOAZ tow was approximately ¾ of a mile, the BOAZ claims to have blown 2 blasts on her whistle, signifying a starboard to starboard passing. The Captain of the GULF STREAM denies hearing such signal. There was no response from the GULF STREAM, but each vessel maintained its respective course until shortly before the collision. Neither vessel attempted to contact the other by radio.

8. Had the vessels continued along their respective courses, they would have passed safely with some 75 to 100 feet between them. However, shortly before the collision, the GULF STREAM suddenly and for some unexplained reason, swung hard to starboard, or to the north, and into the path of the lead barge of the BOAZ tow.

9. When he saw this movement, the pilot on the BOAZ threw the flanking rudders to starboard and threw his engines full astern. The lead barge struck the port side of the GULF STREAM at a point approximately 30 feet aft of the stem.

10. The collision occurred approximately 50 feet from the red buoy line in the Intracoastal Waterway in Bon Secour Bay in the immediate area of buoy 199.

11. Subsequent to the collision, the GULF STREAM circled to the south and sank approximately 200 feet south of the line of black cans.

12. The Master and the deck hand of the GULF STREAM were picked up by the BOAZ 30 minutes after the collision.

13. There is a conflict in the testimony as to whether or not the Master and deck hand of the GULF STREAM

reported to the Captain and Pilot of the BOAZ that prior to the collision they had experienced difficulty steering the GULF STREAM. It is undisputed but that after the accident the cold-rolled steel shaft on the rudder stock of the GULF STREAM was twisted approximately 30 degrees. The Court is of the opinion that if this defect had existed prior to the collision, it would have been impossible to steer the vessel from Bon Secour to the scene of the accident and that in all probability it occurred as a result of the impact with the barge.

### CONCLUSIONS OF LAW

■■ 1. The Court is aware of the narrow channel rule which requires vessels meeting end on or nearly so to pass port to port. There are three exceptions to this rule: (1) local custom (2) special rules and (3) special circumstances making the normal mode of passing unsafe. Under this latter classification, if the situation of one of two passing vessels manifestly requires special consideration on the part of the other, the latter must do what she can to show it. A vessel in complete control of her movements may be required to show special care to avoid a cumbersome tow. *Griffin on Collision,* pp. 71, 72, 73, 74.

■ 2. The testimony in this case, in many respects, is quite conflicting. A few things, however, seem clear. The BOAZ and its tow were on the north side of the channel, that is, north of the center line when under the narrow channel rule, it should have been to the south. It is also clear that the BOAZ and its tow were almost 500 feet in length. It is clear that the GULF STREAM could maneuver more easily than the BOAZ and its tow. It is clear that they met on a straight-a-way and that each was clearly visible to the other for several miles during which time each was on a steady course until they were too close for either vessel to attempt a starboard movement. Captain Nelson said that he thought the BOAZ was on the north side of the channel because of weather conditions, though Pilot Brones testified that weather conditions did not effect his navigation. Captain Nelson testified that he thought the BOAZ had the right-of-way, though he continually maintained that he was waiting for the BOAZ to give him a passing signal. Pilot Brones testified that he gave a two-whistle blast while the vessels were three-fourths a mile apart, which of course, indicated a starboard to starboard passage. Captain Nelson denies hearing any such signal and it is undenied that no answer was given. Captain Nelson admitted that he had ample time to direct his course to port so that a safe starboard to starboard passage could have taken place. The south side of the channel was unencumbered and it was obvious, or should have been, to Captain Nelson that the north side was encumbered by the BOAZ and its long tow and I can see no reason, considering the distance the vessels were apart and the relation each bore to the other, why the GULF STREAM did not yield, but instead turned suddenly to starboard which "was equivalent to running head-long on in a cul-de-sac from which escape was well-nigh impossible." *The Sagaporack,* 4 Cir., 5 F.2d 178–180.

3. The situation is not one where the vessels were on an equality in facility of navigating. *The Fort St. George,* 2 Cir., 27 F.2d 788, 790. I realize that neither the GULF STREAM nor the BOAZ was a burdened or privileged vessel as the only burdened or privileged vessels are set out in Section 23 of Griffin on Collision, page 36, but as stated on page 37 of Griffin:

> "But manifest difficulty in handling a vessel which is very large or one which is encumbered may constitute a special circumstance, for which an allowance should be made by the other vessel."

As stated in Section 32 of Griffin, page 75:

> ". . . Inland Article 18, Rule 1, provides expressly that 'if the course

of such vessels are so far on the starboard of each other as not to be considered as meeting head to head', each shall blow two blasts and they shall pass starboard to starboard. Therefore under the International Rule, no signal is required unless there be a change in course; under the Inland Rule, signals of two blasts should be exchanged. In either rule, obligation to pass starboard to starboard arises from the relative positions of the vessels and does not depend upon an agreement by signal."

It is stated in *"The Delaware"*, 2 Cir., 66 F.2d 467 at page 469:

"It is further contended by the Delaware that the tug was at fault in proceeding on before she received an assent to her two-blast signal. But this is based on the assumption that a head and head situation was presented. If the courses were such as to call for a starboard passing under Rule 1, Article 18, no assent to the signal [is] required." *The George H. Jones*, 27 F.2d 665, 667 (C.C.A. 2).

4. The 1964 case of *Unied States, et al v. M/V Weurttemberg, et al*, 330 F.2d 498, a Fourth Circuit case written by Judge Haynsworth, at page 504 had this to say:

"A close passing in fog is dangerous at any time. Deliberately undertaking it when there were other obvious and safe alternatives was a fault for which the Swerve should be responsible. Judge Learned Hand said, '. . It must always be remembered that it is the risk of collision, not the collision itself, that masters must avoid.' When safe means of avoidance of risks of collision are obviously and ready at hand, their neglect is inexcusable."

5. The case more closely in point with the instant case is *The Cornelius Vanderbilt* and others, reporting at 2 Cir., 120 F.2d 766. At page 767, it was stated:

"When the Watuppa reached a position in the channel abreast of Hunts Point Light she and her tow were on the north side of a narrow channel in violation of Article 25 of Inland Rules of Navigation, 33 U.S.C.A. § 210."

Again on page 768, it states:

"While it found that the Watuppa had navigated on the wrong side of a narrow channel, it concluded that her position did not occasion the disaster because the Hempstead could have avoided the collision by simply holding back in season. We think the libels involved mere questions of fact and that the issues of fact were rightly disposed of."

"The Hempstead was aware of the approach of the Watuppa and her barge in time to avoid the collision and, if she was not, should have seen them but for her neglect to maintain a proper lookout. She had the Watuppa on her starboard hand and, as her master conceded, was bound to give the latter the right of way. The Watuppa, however, having a tow on a long hawser, difficult to manage in dangerous waters, could not readily swing her tow away from the Hemp-its position in the channel. Though each vessel neglected to blow passing signals, as required by the rules, and the Watuppa was on the wrong side of the channel, the outstanding fact is that the Hempstead had the last clear chance to prevent a collision by the exercise of ordinary care at a time when the Watuppa had the right of way and was not in a position to swing her tow away from the Hempstead's barges in time to avert disaster."

6. Even though the BOAZ was in violation of the narrow channel rule, this was not the proximate cause of the collision since the GULF STREAM would have had ample room to pass had she maintained her westerly course.

In accordance with above, a judgment will be entered forthwith.

## JUDGMENT

It is ordered, adjudged and decreed by the Court that the defendant Sabine Towing and Transportation Co., Inc. is entitled to judgment against the plaintiff.

Costs to be taxed to the plaintiff.