## THE DELAWARE.
### No. 413.

Circuit Court of Appeals, Second Circuit.
July 10, 1933.

Macklin, Brown, Lenahan & Speer, of New York City (Paul Speer, of New York City, of counsel), for Standard Transportation Co.

Burlingham, Veeder, Fearey, Clark & Hupper, of New York City (Chauncey I. Clark and P. Fearson Shortridge, both of New York City, of counsel), for The Delaware.

Before MANTON, SWAN, and CHASE, Circuit Judges.

SWAN, Circuit Judge.

The subject-matter of this litigation is a collision which occurred on November 22, 1927, at about 6 o'clock in the evening, between the steamship Delaware and barges in tow of the tug Socony No. 1. Standard Transportation Company, owner of the tug and barges, filed a libel against the Delaware. Clyde Steamship Company, owner of the steamship, filed a cross-libel against the tug. The suits were consolidated and heard together. Both parties have appealed from an interlocutory decree which awarded to each half damages against the other. Each appellant contends that its vessel was free from fault and the collision due solely to the fault of the other.

The tug was proceeding up the Hudson river on a flood tide, bound from Constable Hook to Albany, with three oil barges in tow on double hawsers about 45 fathoms in length. The barges were made up three abreast, which gave the tow a beam of about 120 feet. Each barge was properly lighted, and the tug carried three bright staff lights to indicate the presence of her hawser tow. The steamer was a coastwise vessel, and was proceeding down the river to sea from her berth at Tenth street, New York. The vessels were on approximately parallel courses, the tug being more to the westerly side of the river and slightly west of the center. Having signaled for a starboard to starboard passing, to which the steamer made no reply, the tug pursued her course without deviation and with her tow directly in line behind her. The District Court found that, had the steamer continued her course unchanged, she would have passed the barges safely at a distance of about 100 feet, but that, after passing the tug about 150 feet to starboard, she took a sudden sheer and collided with the tow, causing damage to herself and to two of the three barges.

Witnesses for the steamer denied that she sheered to starboard. They testified that the barges were not following directly in line with the tug, and contended that their tailing toward the New York side was the cause of the collision. But the trial judge found against the steamer on both these issues, and these findings are amply supported, not only by testimony of the navigators of the tug, but also by that of disinterested witnesses from other vessels which were in the vicinity. Moreover, the steamer's witnesses admitted that they had not seen the barges at all until almost the instant of collision. The steamer was navigating with reference to a ferryboat which was crossing the river astern of the tow. Because of the ferryboat, the steamer had reversed her engines and was planning to go under the ferryboat's stern. Since she was oblivious of the presence of the barges, having failed to see their lights, and was navigating to go under the ferryboat's stern after passing the tug, the probabilities are that she did make a turn to starboard, as the witnesses say she appeared to do. For her negligent sheer into collision with a tow which she failed to see, the steamer was properly held at fault.

The District Court found the tug also negligent, "though not so flagrantly as the Delaware." Her negligence was based on a failure to alter her course to port so as to leave more room for a starboard to starboard passing. Since the steamer would have cleared the barges by only 100 feet, had she not sheered, apparently the tug was thought to be guilty of close shaving.

It is urged on behalf of the Delaware that the court below held, and that we should

hold, the tug at fault for attempting a starboard passing instead of passing port to port. We do not so read the opinion. The court found expressly that neither the tug nor her tow was at any time on the port side of the Delaware's course until the latter sheered; therefore the courses were not crossing. The opinion then states that "there is a great deal more doubt whether a head-on situation was not presented which would have required a port to port passing under the rules." This doubt arose from the admission of the tug's captain that when he came out on deck, after the second signal had been blown and the vessels were less than a quarter of a mile apart, he could see a slight tinge of the Delaware's red light. The tug was being navigated by her mate who testified that at no time did he see anything but the steamer's green light. He first signaled for a starboard passing when the vessels were three-fourths of a mile apart and repeated the signal when about a quarter of a mile separated them. It was then too late for the tug to have attempted to draw her barges either to starboard or further to port; the decision whether the situation called for a port or starboard passing had to be made when the vessels were at least half a mile apart. All the testimony is that at that time each vessel saw only the green light of the other. The inference that the tinge of red must have been visible then because Captain Swartout admitted seeing it later does not necessarily follow. The steamer, according to her testimony, had her engines in reverse for three minutes prior to the collision. Backing would pull her stern to port and might bring into view a tinge of her red light which had not before been visible. It was apparently but a fleeting glimpse which Captain Swartout had, for by the time he got to the pilot house he could see only the green light. Numerous witnesses, some of them disinterested, testified that a passing starboard to starboard was the proper maneuver. The tug was safely passed to starboard and the barges would have been, had the steamer held her course. Her captain expressly said that he had no criticism of the navigation of the tug except the swinging of her barges out of line, which was disproved. Had he thought the situation called for a port to port passing he would almost certainly have said so. Although expressing doubt whether a head-on situation was presented, the District Court made no finding that it was. On the record, if we are to make our own finding, we find that it was a starboard passing situation when the tug began to navigate with reference to the steamer.

■ It is further contended by the Delaware that the tug was at fault in proceeding on before she received an assent to her two-blast signal. But this is based on the assumption that a head and head situation was presented. If the courses were such as to call for a starboard passing under Rule 1 of Article 18, no assent to the signal was required. The George H. Jones, 27 F.(2d) 665, 667 (C. C. A. 2).

■■ There remains the question whether the tug should have altered her course to port when she first signaled for a starboard passing. The navigator of the tug believed he was sufficiently off the course of the Delaware to make it prudent to continue. And his judgment would have been proved correct had not the steamer taken a sudden sheer. The course he took did not in any way mislead or confuse the steamer; she expected to pass, and did pass, the tug safely to starboard, and could have passed the tow with a clearance of 100 feet. It is a common occurrence in New York Harbor for vessels to pass safely with even less clearance. It was the steamer's own fault in failing to see the tow and in sheering into it which brought about the collision. Such faults on her part the navigator of the Socony tug had no reason to anticipate. Under these circumstances the rule of The Umbria, 166 U. S. 404, 409, 17 S. Ct. 610, 41 L. Ed. 1053, may well be applied, that where the fault of one vessel is gross, any doubts regarding the management of the other, or the contribution of her faults, if any, to the collision, should be resolved in her favor.

The decree should be modified to hold the Delaware solely responsible, and it is so ordered.