## THE BELLHAVEN.

## THE FREDERICK C. UNDERWOOD.

## BALTIMORE & O. R. CO. v. UNITED STATES.

### Nos. 454, 455.

Circuit Court of Appeals, Second Circuit.
July 23, 1934.

Bigham, Englar, Jones & Houston, of New York City (Leonard J. Matteson, of New York City, of counsel), for libelant.

Martin Conboy, U. S. Atty., of New York City (Charles E. Wythe, Sp. Asst. U. S. Atty., of New York City, of counsel), for the United States.

Before L. HAND, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

This suit arises out of a collision in the Upper Bay at about 6:30 on the evening of October 10, 1928, between the steamer, "Bellhaven," and the tug, "Underwood," which had in tow on her starboard hand the loaded carfloat, "No. 162." As usual, there is little harmony between the two versions, but some things are agreed. The tide was flood, the night clear, the place of the collision was 1,500 feet south from the entrance to "Big Tom" pier; and 600 feet south from the eastward buoy which marked the wreck of "El Sol." The "Bellhaven" was bound out at her full harbor speed of about seven or eight knots; the "Underwood" was bound north for the Manhattan piers, at about six and a half. The bow of the steamer struck the starboard side of the float about midships at an angle of between forty-five and ninety degrees, and cut in far enough to sink it with all the cars. The "Bellhaven" had blown one single blast before the collision, and ported somewhat; had backed and let go her anchor; the "Underwood" had blown at least one two-blast signal, and blew alarms in extremis.

In all else the stories diverge; we must state them separately.

The tug says that she came up on the west side of the channel, holding the "Bessegen" wreck close aboard on her port hand. The easterly buoy of that wreck was very little short of two thousand yards, a nautical mile, from the eastern buoy of "El Sol's" wreck. She laid her course for "El Sol's buoy," meaning to give it just enough berth for safety. When opposite the "Bessegen" wreck she saw the "Bellhaven" on the west side of the channel, bound out, but headed somewhat easterly of the thread, as though she might be crossing to the outside. At a distance of two miles she gave her a signal of two blasts; getting no answer, she bore on, holding her course until she got within half a mile, or perhaps three-quarters, when she gave the "Bellhaven" a second signal of two blasts. The "Bellhaven" had meanwhile come down to nearly opposite the wreck of "El Sol," and had ported a little, straightening in the channel; she did not answer. So matters stood, safely for a starboard passing with a wide berth, when quite unaccountably the "Bellhaven" blew a single blast, ported and came down upon her. There was nothing to do but keep on, and try to cross her oncoming bows. This the tug did, putting on all possible speed, and in extremis hard-a-porting to kick away her stern. The "Bellhaven" hit the middle of the float at about forty-five degrees, nearly cut it in two, and so far careened the tug as almost to make her turn turtle.

The "Bellhaven" says that she was coming down straight and only a little to the west of the thread of the channel. When above "El Sol" she made out the tug's red light and towing staff lights about a point on her port bow and some one or two thousand feet below her, safely over for a port passing. Accordingly the tug sounded a single blast, to which she replied, porting a little, very little, say two degrees. The tug, disregarding this agreement, shortly thereafter hard-a-starboarded, changed her heading ninety degrees and crossed the "Bellhaven's" course at right angles. Of this mad navigation she gave warning by a double blast; some of the witnesses say she repeated it. The "Bellhaven," with great address adapting herself to this monstrous behaviour, stopped, backed and let go her starboard anchor. Not only had she stopped, but she must have backed far enough to be over the anchor, for the chain led straight down; one witness says it led forward. The tug, at last awake to her danger,

cast off the float which the floodtide carried upon the bows of the stationary "Bellhaven."

Two witnesses, not directly concerned in the collision, in part corroborated the tug's story, but one was in the libellant's employ, and the judge discredited the other, though, so far as we can see, without any reason. This witness, a ferryman, spoke of a ship coming up on the east side of the channel ahead of his ferry, and about even with the tug, which he put near to the west edge of the channel. There certainly was such a ship, the "Wytheville," and she was where this witness says, but the "Bellhaven" put her and the ferry well below the tug. But the "Bellhaven's" witnesses were not originally sure just what was the vessel that gave her the single blast; they only "took it" to be the tug; and while the "Wytheville" was indeed rather far below the "Bellhaven" to signal her, she might have done so. It is therefore quite possible that it was she who gave the signal which the "Bellhaven" answered.

■ The judge disposed of the case, in part at any rate, on the assumption that the tug was at fault for attempting to carry out a starboard passing without getting the "Bellhaven's" assent. He appears to have assimilated such a passing to a crossing situation, or to a passing case where the vessels are head and head, for he cited our decisions in The John King, 49 F. 469, and The Dauntless, 3 F.(2d) 529, in support of his conclusion. This was a mistake. If the vessels are in position to pass starboard to starboard, the rule does not require an assent to the proposal so to pass; they must do so; the rule does not require one to start across the other's bows, or to stop and back. In The Dauntless, supra, we had before us a case where the vessels were head and head, and where one tried to pass starboard to starboard without an agreement. That is a totally different situation from that at bar, where, if the facts are as the tug says, she needed no assent to keep on unless she was uncertain about the other vessel's navigation. Again, while the judge was right in putting the burden upon the tug to excuse coming up on the wrong side of a narrow channel, he was wrong in not clearing her; her lights were all visible in the clear night and she could have been made out in ample season if the lookout had been good. We have often held that if the offending vessel is visible by the other in time to shape her movements accordingly, and if she does not impede the other's navigation by her

unlawful position, her fault has not contributed. La Bretagne (C. C. A.) 179 F. 286; Commonwealth, etc., Line v. Seaboard Transp. Co. (D. C.) 258 F. 707; The Socony No. 19 (C. C. A.) 29 F.(2d) 20; The Perseverance (C. C. A.) 63 F.(2d) 788; Eastern Steamship Lines v. Tug Syosset (C. C. A.) 71 F.(2d) 666. Thus there is really no question of law involved. If the tug did indeed come up on the west side and in full view, and if the "Bellhaven" ported to her, the "Bellhaven" alone is guilty; if on the other hand the "Bellhaven" was coming down on her own side of the channel, and after an exchange of single blasts the tug starboarded across her course, the "Bellhaven" was blameless and the tug has herself to thank.

The judge further found as matter of fact that the vessels had agreed upon a port to port passing, and quite correctly concluded that if that were once settled, the rest followed. In making this conclusion he seems to have depended altogether upon his impression of the witnesses, for he declared that he could find nothing to choose in probability between the two versions. There was indeed an improbability in either, yet, if the "Bellhaven's" story be taken at its face, it is decidedly the less likely; indeed it is impossible to accept it at all without some reconciliation of its glaring inconsistencies. The tug is represented as about a point off the "Bellhaven's" port bow when one or two thousand feet away, headed if not on a parallel course, then off more to the eastward. From this position under a starboard helm she swung across the "Bellhaven's" bows so much as to make the collision at a right angle, the "Bellhaven" holding substantially to her old course. The absurdity of this is apparent when we consider that the float was nearly three hundred feet long, and that at one thousand feet the tug would have been only two hundred to the east of the "Bellhaven's" projected course, and at two thousand feet, four hundred feet. The manœuvre ascribed to the tug would therefore involve a turn of ninety degrees in a lateral movement of little more than the float's own length. As between anything of the sort and an unaccountable sheer to starboard of the "Bellhaven," the probabilities seem to us strongly to favor the second. However, it has long been the custom of admiralty judges to accept a story generally, of which they are obliged to reject the particulars, mending it, as it were, in its weaker spots. Indeed, it would often be quite impossible otherwise to reach any decision at all, for the ardor of each side frequently colors both versions too much for the complete acceptance of either. Here, for example, we might say that the swing of the tug to port was nothing like so much as the "Bellhaven" supposed, and that the angle of collision instead of being ninety degrees was forty-five, as the tug puts it. One might also assume that the "Bellhaven" had ported more than she says. Even then the improbability of the tug's navigation remains very great. It is the first impulse of any master when confronted with a vessel ahead to port his helm; no conceivable reason can be suggested here, why the tug, if passing safely by a margin of two hundred feet, should swing across the river. She was by hypothesis on her own side of the channel; she was bound for the New York shore; her crossing would bring her into the wreck of "El Sol," or at best upon the anchorage ground just below; quite off her course. The "Bellhaven" says that there was a tow to the west of her and one in front of her. Surely in the light of all this, any such manœuvre is highly improbable. Indeed the pilot and master of the "Bellhaven" regarded it as a crazy freak.

On the other hand the tug's version, though ascribing to the "Bellhaven" a port helm at the wrong moment, is not entirely unreasonable. That the tug gave a double blast when opposite the "Bessegen" wreck, two miles off, we do not believe; but it is not important to the result. That she was in fact coming up along the west side of the channel seems to us almost certain; both sides agree that the collision took place about six hundred feet south of "El Sol." If she had come across to that spot on a starboard helm she put herself quite needlessly into a pocket from which there was no escape; not so, if she was bound straight up as she says. This being conceded, it is entirely possible that the "Bellhaven" exchanged signals with the "Wytheville." Why, if she did, being safely off to port, she should have ported still further remains unexplained, as indeed this collision must on any theory. But we need not suppose that she had ported so much as the tug says. She may have been suddenly confronted with the tow because of a bad lookout, and having ported, have supposed that she was in extremis. To let go her starboard anchor would turn her head to that side; which would be further augmented by backing, for she backed to starboard. If meanwhile she was still moving, she would be in fact gaining ground into the tug's waters, changing her heading all the time. The collision would thus appear to be due to a wan-

ton change of helm, when it was really caused by quite unnecessary action in extremis. This mitigates the extravagance of the ship's navigation; but on any showing it is far less improbable than that of the tug as the ship gives it.

We are indeed not ordinarily given to reversing the District Court upon an issue of fact, though of course we have an eventual responsibility for the facts as well as for the law. But there are a number of considerations which take this case out of the ordinary rule. The judge did not see any of the "Bellhaven's" witnesses except the pilot; and he was not so much impressed as we cannot help being by the absurdity of their story on its face; especially by the extreme hardihood of saying that the collision happened because the tug cast off the float to drift down upon the flood tide against the bows of the anchored "Bellhaven." Such a yarn discredits all who share in it; no plausibility in the telling of it can give credence to it or to them. Further, as we have said, the opinion depends in some part anyway upon the burdens of the tug; errors of law.

Decree reversed; decree to be entered on the libel and dismissing the cross-libel.