**READING CO. v. THE BLOM-MERSDYK et al.**

**THE NO. 20.**

**No. 319 of 1951.**

United States District Court
E. D. Pennsylvania.

April 10, 1953.

Rawle & Henderson, Philadelphia, for libellant.

Burlingham, Hupper & Kennedy, New York City, and Clark, Ladner, Fortenbaugh & Young, Philadelphia, for respondents.

CLARY, District Judge.

This is an action by the Reading Company, owner of Carfloat No. 20, against the Steamship Blommersdyk for damages resulting from a collision in the Delaware River on October 21, 1951. From the pleadings and proof I make the following

Findings of Fact

1. Libellant Reading Company, a corporation, was at all material times owner of Carfloat No. 20. The carfloat was a steel hull vessel equipped to carry eight freight railway cars on two tracks running the length of the flat deck surface. It was 200 feet long and 35 feet wide, and had no motive power.

2. On October 21, 1951 about 10 A.M. the said carfloat loaded with eight railway cars filled with coal left the libellant's dock at Port Richmond, Philadelphia, for Bulson Street, Camden, in tow of libellant's tug Cheltenham. Carfloat No. 7, similarly constructed and loaded with eight partly filled cars, completed the tow. The carfloats were secured on either side of the tug with their bows together, so that the flotilla resembled an arrowhead.

3. Tug Cheltenham was 92 feet long, 19 feet in width, was registered at 113 gross tons, developed 325 horsepower, and had a top speed of 5 or 6 knots. At all times material to this action, the tug was in good operating condition and responded properly to her controls. She had her full crew aboard.

4. The tug captain in charge of the flotilla was licensed to operate tugs on the Delaware River, and had commanded various tugs of the libellant company with carfloats in tow for several months prior to October, 1951. He had been following the sea for 15 years and was licensed as a master of merchant vessels before he became employed by the libellant.

5. On the morning of October 21, 1951, the weather was overcast but clear. There was very little wind. The tide was ebbing at about 1 to 1½ knots, and visibility was excellent for several miles up and down the river.

6. The flotilla proceeded down the main ship channel (800 to 1000 feet in width) at a speed of approximately 5 knots to the right of the center line and at about midway of the western half of the channel. When the flotilla reached the general vicinity of Fairmount Avenue, Philadelphia, the master of the tug decided to change his course from a general southerly direction to a general southeasterly direction, intending to cross toward the New Jersey side at an angle of approximately 45 degrees to the main ship channel. As he executed the maneuver of change of course and as he brought the flotilla around and headed it for the Jersey shore, the master of the tug and his lookout in the pilothouse observed the Steamship Blommersdyk coming upriver slightly to the east of the center line of the ship channel in the vicinity of Market Street, Philadelphia, operating under her own power. At that time the flotilla was some 2000 feet north of the Delaware River bridge and the Blommersdyk was some 1500 feet to the south of the Delaware River bridge.

7. Steamship Blommersdyk, owned and operated by the respondent company, was a general cargo vessel approximately 400 feet long, having a maximum speed of 12 knots. Her engines were running at half speed as she passed the Market Street ferry slip, and she was making a course straight up the channel.

8. At the point indicated in Finding No. 6, the Tug Cheltenham sounded a two-blast whistle signal to call the attention of the approaching vessel to the tug's intention to cross her bow.

9. To this signal the Steamship Blommersdyk made no response but continued course and speed for a distance of approximately two ship lengths, at which time she blew a danger signal of four-blasts. At that time the distance between the vessels had narrowed to approximately 2000 or 2200 feet. At that point the tug and flotilla had reached or passed the center line of the ship channel.

10. The Tug Cheltenham continued on its crossing course and responded to the

danger signal with another two-blast signal declaring its intention to cross the bow of the Blommersdyk.

11. The Blommersdyk continued at unabated speed from the point at which it gave its first danger signal (a point about 700 feet south of the bridge) for a distance of approximately 1300 to 1500 feet and for a period in time of approximately 2 to 2½ minutes when it gave another four-blast danger signal. This last signal came at a time when the vessels were only about 400 feet apart and a collision was inevitable.

12. With the second danger signal given by the Blommersdyk, orders were given at 11:22 A.M. to stop engines, reverse engines, full speed astern, and to drop anchor. The anchor was dropped when the vessels were approximately 200 feet apart.

13. With the second danger signal, the Tug Cheltenham reversed engines and succeeded in taking off its forward way at the moment of impact. It was, however, still moving downstream with the ebbing tide at 1 to 1½ knots.

14. The Blommersdyk overrode its anchor and collided with Carfloat No. 20 at a point approximately 60 feet from the bow of the Carfloat, causing damage to the Carfloat and to a loaded coal car on its deck. At the moment of impact the Blommersdyk was still moving forward at a speed of 2 to 3 knots and pushed the flotilla upstream a short distance against the tide. The point of collision was approximately 1000 feet north of the Delaware River bridge and near the eastern edge of the ship channel. From the Delaware River bridge to the point of collision the Blommersdyk altered its course slightly to starboard.

15. There was minimal damage to the Blommersdyk for which no claim was made.

16. Carfloat No. 20 was damaged necessitating repairs, the fair reasonable value of which I find to be $9,199.06. The damage to the coal car I find to be $909.54, and the value of the lost coal to be $167.10. Total damages of $10,275.70.

17. The libellant has not established by competent proof its claim for towing charges by libellant's tug in the amount of $350.

18. The collision resulted from the combined negligence of the master of the Tug Cheltenham and the pilot of the Steamship Blommersdyk.

19. The Tug Cheltenham was at fault in attempting a crossing in the narrow channel at a time and under circumstances when a crossing could not be safely made.

20. The Steamship Blommersdyk was at fault in continuing its course, a collision course, and failing to stop when it was apparent that there was danger of collision.

21. There were no other vessels in the vicinity of the Cheltenham and the Blommersdyk, the Delaware River being entirely free of any traffic which would interfere with the operation of either vessel.

## Discussion

This was a collision which should not have happened. The testimony of the various witnesses was conflicting in many respects, but there was an area of general agreement as to certain physical facts and land locations which permit a reconstruction of the occurrence with a reasonable degree of plausibility. Witnesses on both the tug and the Blommersdyk are generally agreed that when the vessel sighted each other, the tug was approximately off Fairmount Avenue in the middle of the western side of the ship channel and angling toward New Jersey. All witnesses but one testified that at that time the Blommersdyk was off the Market Street ferry slip, slightly to the east of the center of the ship channel. These two points, both by estimation of witnesses and measurements on the charts in evidence, indicate that there was a straight line distance of approximately 3500 feet separating the two vessels. Nearly all witnesses agreed that it was when the vessels were at the points above indicated that the tug blew a two-blast whistle signal indicating its intention to cross the bow of the Blommersdyk, the privileged vessel. The testimony rather clearly fixes the point of collision across from Pier 24 North, which by chart measurements would place the point of collision about 1000 feet north of the bridge.

█ I have no hesitancy in finding that the Tug Cheltenham committed a gross navigational fault in attempting to effect a crossing of the channel under the circumstances then existing without receiving from the upcoming vessel an assent to its proposal to do so. The tug was also at fault for failing to take measures to maneuver to keep out of the way of the privileged vessel after receiving a danger signal in answer to its two-blast proposal to cross.

The only area of doubt concerns the privileges and duties of those in charge of the Blommersdyk under the circumstances in which they found themselves by reason of the attempt of the Cheltenham to cross its bow. Captain Hertogs, master of the Blommersdyk, testified that under the rules of navigation, it was not only the privilege of the Blommersdyk to maintain course and speed under the circumstances but that it was under a positive duty to do so. This contention has some support in the rule announced in The Delaware, 1896, 161 U.S. 459, 16 S.Ct. 516, 40 L.Ed. 771, and most recently followed in Compania de Navegacion Cebaco, S. A. v. The Steel Flyer, 4 Cir., 1952, 200 F.2d 643. On the other hand, the libellant argues that there is no right of way into a collision, that there was duty on the part of the Blommersdyk to stop if the signal of the tug was unacceptable, and that if that minimal duty had been performed, the collision could not have happened. In asserting that position, the libellant relies on the holding in Postal S. S. Corporation v. Southern Pacific Co., 2 Cir., 1940, 112 F.2d 297.

█ This was a crossing situation and the Blommersdyk was the privileged vessel and under a duty to maintain her course and speed, Articles 19–23, Inland Rules, 33 U.S.C.A. § 204 et seq. But the privileged vessel had no absolute right to keep her course and speed regardless of the danger involved in that action. Rule VII of the Pilot Rules promulgated by Supervising Inspectors, now at 33 C.F.R. § 80.7, recognized the privilege to maintain course and speed, but provided for a departure from the statutory rule in the second paragraph of Pilot Rule VII in the following language:

"If from any cause the conditions covered by this situation are such as to prevent immediate compliance with each other's signals, the misunderstanding or objection shall be at once made apparent by blowing the danger signal, and both steam vessel shall be stopped and backed, if necessary, until signals for passing with safety are made and understood."

The Rules of the Supervising Inspectors were held by the Supreme Court "not essentially inconsistent with the statute and are valid, both the statutory provisions and the Inspectors' Rules being designed to promote safety in situations fraught with danger." Postal S. S. Corporation v. Southern Pacific Co., 1939, 308 U. S. 378, 60 S.Ct. 332, 337, 84 L.Ed. 335.

Under the provisions of Pilot Rule VII, therefore, the right of the Blommersdyk to maintain her privilege ended when there was danger of collision, and she, as well as the tug, was under a duty to stop and back if necessary until signals for passing with safety were made and understood. At what point was there danger of collision? It appears clear to me that that point was reached not later than when the Blommersdyk sounded its first danger signal, at which time more than 2000 feet separated the two vessels. From the courses and speeds of the vessels it is clear that at that time there was danger of collision, and the privilege of the Blommersdyk to maintain course and speed ended. Had she then performed her duty to stop and back, if necessary, this collision could not have taken place. Her failure to stop and back at that point was a violation of Rule VII and constituted negligence which contributed to the happening of the collision and the damages must therefore be divided. Postal S. S. Corporation v. Southern Pacific Co., 2 Cir., 1940, 112 F.2d 297.

### Conclusions of Law

1. The Court has jurisdiction of the parties and the subject matter of this suit.

█ 2. The narrow channel rule applies to the Delaware River in the area just north of the Delaware River bridge.

3. From the time that the first signal was given by the Tug Cheltenham a crossing situation existed.

4. The collision was caused by the following faults on the part of the Tug Cheltenham:

(a) Attempting to cross the Blommersdyk's bow when the speeds of the vessels and the distance separating them made such a maneuver highly dangerous.

(b) Persisting in continuing its speed and course after having received a belated danger signal from the Blommersdyk.

5. The Steamship Blommersdyk contributed to the collision by committing the following faults:

(a) Delaying a signal response to the proposal of the Tug Cheltenham to cross its bow at a time when the vessels were some 3500 feet apart.

(b) Altering course slightly to starboard after its first danger signal.

(c) Continuing its course and speed for approximately 2½ minutes after giving a danger signal in response to the declaration of the Tug Cheltenham to cross her bow.

(d) In failing to stop and back, if necessary, when danger of collision was imminent and until signals for passing with safety were made and understood.

6. The damages of $10,275.70 will be divided between libellant and respondent.