**TUG NEW YORK COMPANY as owner of THE AGRAM,**

v.

**THE ROBIN DONCASTER and Seas Shipping Company, Inc.**

**Petition of Robert B. WATHEN, as owner of THE RUTH, for exoneration from and limitation of liability.**

**Nos. 37, 45.**

United States District Court
E. D. Pennsylvania.

Jan. 25, 1955.

Conlen, LaBrum & Beechwood, Philadelphia, Pa., for Tug New York Co. & Sheridan Transp. Co.

Clark, Ladner, Fortenbaugh & Young, Philadelphia, Pa., and Krisel, Beck & Taylor, New York City, for Robert Wathan and The Ruth.

Krusen, Evans & Shaw, Philadelphia, Pa., for Seas Shipping Co., Inc.

Rawle & Henderson, Philadelphia, Pa., for Great American Ins. Co.

Barnes, Dechert, Price, Myers & Rhoads, Philadelphia, Pa., for Pennsylvania R. R.

GANEY, District Judge.

These consolidated suits bring before us a number of claims which arose out of a collision in the Delaware River on the night of January 9, 1952, involving the steamship Robin Doncaster and the barge Agram while she was being towed by the tug Ruth.

The first suit was brought by the owner of the barge Agram against the S. S. Robin Doncaster and her owner for collision damages. The second suit was instituted by the owner of the tug Ruth for exoneration from, and limitation of, liability. Damage claims were also filed in this proceeding by Seas Shipping Company, Inc., as owner of the Robin Doncaster, and by owners of cargo on board the Doncaster who were allegedly liable to make contribution in general average as a result of the damage and delay sustained by the Robin Doncaster. The matter is now before us for the determination of liability for the collision.

From the evidence presented to it, the Court makes the following special

Findings of Facts:

1. The Tug New York Company, libellant in the first suit, was the owner of the barge Agram, a non-propelled, wooden hull barge, 267 feet in length, 46 feet wide and 23.5 feet in depth, and of 2,129 gross tons. Her two anchors hung on each side of her hull approximately five feet from the bow. Her hull, machinery and equipment were in good condition, and she had been inspected prior to her taking on a cargo of 3,040 tons of coal at Norfolk, Virginia, on January 8, 1952.

2. Robert B. Wathen, libellant in the second suit, was the owner and operator of the diesel-engined tug Ruth, which was 117.5 feet long, 28 feet wide, 13.5 feet in depth, and of 275 gross tons. Her engines were of 1,200 horsepower.

3. Seas Shipping Company, Inc., was the owner and operator of the steamship

Robin Doncaster, a steel hull, single screw vessel, 480 feet long, 66 feet wide, 29.5 feet in depth, of 7,085 gross tons and propelled by a steam turbine of 6,300 horsepower. At full speed the Doncaster travels 15 to 15½ knots, and her propeller turns 78 revolutions per minute; at half speed, her propeller turns 40 revolutions per minute. Both the vessel and her owner are respondents in the first suit.

4. Just below Philadelphia, the Delaware River flows in an east-west direction for about 2 nautical miles. At the western end of this stretch at a point marked by Buoy 35 on the Pennsylvania side of the river, the channel curves in a north, northeasterly direction for ¾ of a mile to a point marked by Buoy N48 on the New Jersey side of the channel. This curve is known as Horseshoe Bend. From the latter point the channel straightens out in a north, northeasterly direction for a distance of 1¾ miles. An imaginary straight line ¾ of a mile long in the center of the channel beginning at the southern end of the 1¾ mile stretch is called East Horseshoe Range. Range lights situated on the New Jersey shore just below Horseshoe Bend assist navigators in keeping their bearings with respect to the Range. At the northern end of the 1¾ mile stretch, 1,500 feet below Pier 98 South, Philadelphia, Pa., the channel curves in a north, northwesterly direction. Beginning slightly above Buoy N48 there is anchorage space between the eastern edge of the channel and the New Jersey shore.

5. The channel of the Delaware River from Horseshoe Bend to Pier 98 South has a width of 1,000 feet and a depth of 37 feet. The river end of Pier 98 South, Philadelphia, Pa., extends to the western edge of the channel. The Windy Point Coal Pier, also in Philadelphia, is, as its name indicates, a coal loading pier. On its south side there is a slip 1,050 feet long and 322 feet wide. The river end of the pier is approximately 580 feet from the western edge of the channel. This pier is 1.1 miles downstream from Pier 98 South, and six-tenths of a mile north of the southerly end of East Horseshoe Range. Buoy 39 is 690 feet south of Windy Point Coal Pier, and Buoy 37 is approximately 3,950 feet below Buoy 39. Both buoys are on the western edge of the channel.

6. On the morning of January 8, 1952, the tug Ruth had taken the loaded barge Agram in tow at Norfolk, Virginia, and towed her up the Chesapeake Bay, through the Chesapeake and Delaware Canal and up the Delaware River. The tug was secured along side the barge's port quarter by five lines; her bow was a short distance aft of midships and her stern protruded a few feet aft of barge. The draft of the barge was 22 feet forward and 23 feet aft. The wheelhouse of the Ruth was about 15 to 20 feet forward of the barge's wheelhouse which was located on the top of the afterhouse of the barge. The wheel of the barge was lashed in a stationary position so that the barge would maintain a slight left rudder. Long experience has proved that this was proper practice to keep the tug and barge on a steady course when the tug, as here, was on the barge's port quarter.

7. The Ruth was fully manned, equipped and in all respects seaworthy and fit for the service in which she was engaged. The captain of the Ruth was in charge of the navigation of the Agram, and the crew of the latter took orders from him.

8. On the evening of January 9, 1952, the weather was fair and clear, the night was dark but visibility was good; there was a light southwest wind and the tide was at the beginning of flood traveling at the rate of .75 knots. All the vessels involved were carrying correct lights which were clearly visible.

9. At about 8 o'clock p. m. on the night of January 9, 1952, the tug Ruth with the Agram lashed on her starboard side was traveling up the Delaware River at the rate of 4 to 5 knots. The flotilla was slightly to the right of the center of the channel and was approaching Horseshoe Bend.

10. When the tug and tow approached the curve in the river at Horseshoe Bend, the steamship Mormacpenn, a vessel whose dimensions were comparable to that of the Doncaster, was approximately 1,200 feet astern and on the edge of the channel. When the tug and tow were between Buoys 35 and 37, the Mormacpenn blew a short one-whistle signal for the purpose of obtaining permission to pass the tug and tow on their port side. The Ruth did not answer the signal but began to turn to her starboard or the eastern side of the channel in order to give the Mormacpenn room to pass on the port side.

11. Meanwhile, the Doncaster, which had been docked on the north side of Pier 98 South with her port side to the pier, was being undocked with the aid of two tugs. Her draft at the time was 14 feet at the bow and 15 feet at the stern; the edge of her propeller was 6 feet above the surface of the river. After the vessel was clear of the dock at 8:03 o'clock, she was backed out approximately 300 feet into the channel. At 8:13 the engines of the vessel were put at half speed ahead and a Delaware River Pilot took over the navigation of the vessel from one of the tugboat captains who had acted as the undocking pilot. At about this time, the Doncaster observed the tug Ruth and her tow at a distance of a mile and a half away proceeding up the East Horseshoe Range.

12. The Doncaster then proceeded down-river on a course which brought her over to the east side of the channel so that she could avoid a vessel anchored cross-wise just to the west side of mid-channel 400 feet below Pier 98 South.

13. After the tug and tow had proceeded up the river and to the right for a short distance, and were approaching East Horseshoe Range, the Ruth observed the Doncaster off her starboard bow proceeding on the eastern side of the channel at a distance of about 1¼ miles away and showing her green lights. Their courses were so far on the starboard of each other as not to be con-

sidered as meeting head and head. The Ruth then sheered slightly toward the center of the channel. The Mormacpenn, having observed the tug and tow's change of course, slowed down, and after proceeding for a short interval on the eastern edge of the channel, signaled with two short blasts indicating her willingness to pass the tug and tow on their starboard side. The Ruth did not respond to this signal either, but maintained her position slightly to the left of mid-channel as she approached or continued up East Horseshoe Range.

14. Taking into account the position of the Doncaster on the east side of the channel and the Mormacpenn's second signal to pass on the starboard side, the Ruth gave a two-blast signal indicating that she desired to pass the Doncaster starboard to starboard. At the time there was sufficient room on the east side of the channel for the Doncaster to pass safely between the tug and tow and the Mormacpenn in the eastern side of the channel. In the meantime the Mormacpenn, aware of the Doncaster's position, stopped near the eastern edge of the channel to await development.

15. The situation confronting the Doncaster called for a starboard to starboard passing with the tug and tow. Nevertheless, the Doncaster, which was traveling downstream at a speed of 6 to 7 knots, answered with a one blast signal indicating that she desired to pass port to port—as she began to turn to her starboard with a right rudder of from 10 to 15 degrees. This course was maintained by her for the next four minutes. At the time the Doncaster's rudder was first ordered right, the tug and tow were on her starboard bow and the distance between them was ½ to ¾ of a mile.

16. After the Doncaster's signal, the tug proceeded a short distance, and when she observed the Doncaster's direction, she gave the danger signal and two, indicating that she still desired to pass on the starboard side and that it would be dangerous to do otherwise. At this time

the Ruth reduced her engines to half speed.

17. In response the Doncaster blew the danger signal and one indicating that she still desired to pass port to port. At the time the vessels were 1,500 feet apart.

18. In answer to this signal, the tug gave the danger signal again. When the Doncaster continued on the same course, the tug reversed her engines full speed astern and signaled with three blasts that her engines were in reverse.

19. When the tug and the vessel were approximately 500 feet apart, the pilot on the Doncaster ordered the rudder hard right.

20. At 8:23 o'clock, when the vessels were 200 feet apart and in the vicinity of Windy Point Coal Pier, the Doncaster signaled that her engines were in reverse.

21. However, the Doncaster continued to move forward in a southwesterly direction, and at 8:23½ her bow on the port side, about five feet from her stem, came into collision at an angle of 50 degrees with the stem of the Agram.

22. No agreement had ever been reached between the Ruth and the Doncaster as to the manner of passing each other.

23. After the collision, the Doncaster proceeded across the bow of the barge, whose port anchor gouged several of the hull plates on the port side of the Doncaster's bow at about the 24 foot draft mark from just aft the stem to the flare of the bow.

24. When she cleared the barge, the Doncaster continued in an arc across the western side of the river and went into the slip on the south side of Windy Point Coal Pier, her starboard bow striking the south side of the pier about 350 feet in from the river end at an angle of 30 degrees, and came to a stop, with the aid of her anchors, a few feet from a vessel docked near the shore end of the pier.

25. The collision occurred at a point slightly to the west of mid-channel and 400 feet south of Windy Point Coal Pier or 100 to 200 feet north of Buoy 39.

26. At the time of collision the tug and her tow were making headway at no more than 2 knots or just enough speed to maintain steerage, while the Doncaster was traveling at the rate of from 5 to 6 knots—the reversal of her engines having had insufficient time to check her forward speed.

27. As a result of the collision, the barge Agram was damaged to such an extent that the cost of repairs was greater than her value, and she, therefore, was declared a constructive total loss.

### Discussion

Although the evidence was conflicting, we think its preponderance clearly established that the Doncaster was at fault.[1] The answer to the question whether the Ruth was also at fault presents a more difficult problem.

Article 25, 33 U.S.C.A. § 210, of the so-called inland rules provides as follows: "In narrow channels every steam vessel shall, when it is safe and practicable, keep to that side of the fairway or mid-channel which lies on the starboard side of such vessel." In reliance on the application of this article and the familiar rule [2] enunciated in The Pennsylvania, 19

---

1. The City of Macon, 3 Cir., 1899, 92 F. 207; The Atlantic City, 3 Cir., 1906, 143 F. 451; The Margaret, 3 Cir., 1929, 30 F.2d 923; The La Bretagne, 2 Cir., 1910, 179 F. 286; The Californie, 2 Cir., 1918, 250 F. 790; The Delaware, 2 Cir., 1933, 66 F.2d 467; The Bellhaven, 2 Cir., 1934, 72 F.2d 206; The Wrestler, D.C.S.D.N.Y.1912, 198 F. 583.

2. "But when, as in this case, a ship at the time of a collision, is in actual violation of a statutory rule intended to prevent collisions, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster. In such a case the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been. Such a rule is necessary to enforce obedience to the statute."

Wall. 125, at page 136, 86 U.S. 125, at page 136, 22 L.Ed. 148, to the facts in the instant suits, respondents claim that the Ruth was at fault and that there is a presumption that this fault was at least a contributory cause of the collision.

It is true that when the Ruth and her tow came upon the scene they were near mid-channel. An attempt to get nearer the eastern edge of the channel was made by the Ruth but she changed her mind and veered back to her left when she observed the Doncaster on the eastern side of the channel. The Ruth thought it prudent to stay near the center of the channel for three reasons: First, she did not desire to force the Doncaster to steer over into the western side of the channel in violation of the Passing Rule,[3] for they were so far on the starboard of each other as not to be considered as meeting head and head. Second, she desired to give the large vessels, which were already on that side, as wide a berth as possible to pass each other in the eastern portion of the channel. And third, she did not want to be in the position of having two large vessels passing in different directions on opposite sides of her which would have subjected her to the wash of two vessels and make management of her cumbersome tow more difficult.

 The narrow channel rule is not an absolute one. By its very terms the rule is to be followed only "when it is safe and practicable" to do so. In our opinion it was safer and more practicable for the Ruth to stay near mid-channel, and under the circumstances she did not violate the narrow channel rule. The fact that she initiated the request for a starboard passing did not weaken her cause for staying where she was.

Of course it may be argued on the Doncaster's part that it would have been unwise to pass the Ruth in that fashion in view of the presence of the Mormacpenn in the eastern part of the channel. True, it is, distance and speed of vessels are difficult to estimate with accuracy on a dark night. However there was sufficient room for the two large vessels to pass each other in the eastern portion of the channel and the Ruth was in a better position than the Doncaster to know this. The Doncaster should have relied on the Ruth's judgment or have stopped in her course.

The Ruth, by proposing a starboard passing, was not compelling the Doncaster to take a course of action contrary to the inland rules, but was doing what Article 18 of those rules required. The situation was not one of the tug's making, but that of the Doncaster's in putting herself on the east side of the channel in a position that required the vessels to pass starboard to starboard. Apparently the pilot of the Doncaster believed that he was required to pass port to port under Article 18 of the inland rules. It was this belief together with his eagerness to get over to the western side of the channel where the Doncaster belonged that led to the collision.

It would seem that the real complaint of the respondents is that there was only a technical instead of a gross violation of the narrow channel rule. For if the Ruth and her tow had been further over in the western portion of the channel, the accident, in all probability, would not have occurred.

Conclusions of Law

1. This court has jurisdiction of the parties and the subject matter of these suits.

 2. The stretch of the Delaware River Channel between Pier 98 South and Horseshoe Bend is a narrow channel. See The Trim, D.C., 30 F.Supp. 283.

3. This rule, Article 18, Rule 1, 33 U.S.C.A. § 203, provides among other things as follows: "But if the courses of such vessels are so far on the starboard of each other as not to be considered as meeting head and head, either vessel shall immediately give two short and distinct blasts of her whistle, which the other vessel shall answer promptly by two similar blasts of her whistle, and they shall pass on the starboard of each other."

3. When the Ruth gave the first signal, the vessels were not approaching each other head and head; their positions were such that a starboard to starboard passing was required. See Construction Aggregate's Co. v. Long Island R. Co., 2 Cir., 1939, 105 F.2d 1009, 1011.

4. The collision between the Doncaster and the Agram was caused by the negligence of the Doncaster.

5. The Doncaster was negligent, in the following respects:

a. In changing course to starboard and endeavoring to cross the bow of the tug and tow and attempting to convert a starboard to starboard situation into a port to port passing without having come to a passing agreement with the Ruth;[4]

b. In failing to slow down or come to a stop when an agreement for passing in safety was not obtained from the Ruth;

c. In continuing on her course with unreduced speed after danger became apparent; and

d. In failing to reverse her engines much sooner than she did.

6. Under the circumstances it was not safe and practicable for the Ruth to maneuver to the eastern side of the channel; she did not violate the narrow channel rule.

7. The Ruth was justified and exercised reasonable discretion in not attempting a port to port passage with the Doncaster.

8. Robert B. Wathen, as owner of the tug Ruth, is entitled to a decree of exoneration from liability for the damage sustained by the Agram.

9. Tug New York Company is entitled to a decree against the steamship Robin Doncaster and Seas Shipping Company, Inc., for collision damage sustained by the Agram.

Accordingly, the parties may submit appropriate decrees.

4. The La Bretagne, 2 Cir., 1910, 179 F. 286, 288; The Delaware, 2 Cir., 1933, 66 F.2d 467; The Bellhaven, 2 Cir., 1934, 72 F.2d 206; The Wrestler, D.C.S.D. N.Y.1912, 198 F. 583; Griffin on Collision, p. 77.