**132**

BARGE LAKE FARGE CORPORATION,
Owner of THE Barge T. J. SHER-
IDAN, Libellant,

v.

THE S.S. SAXON, her engines, boilers,
tackle, etc., Saxon Steamship Company,
Inc., Owner of the S.S. Saxon, and Is-
brandtsen Company, Inc., Operator of
the S.S. Saxon, Respondents.

SAXON STEAMSHIP COMPANY, Inc.,
Owner of the S.S. Saxon, Cross-
Libellants,

v.

BARGE LAKE FARGE CORPORATION,
Owner of the Barge T. J. Sheridan, and
the Barge T. J. Sheridan, her engines,
boilers, tackle, etc., Cross-Respondents,
and
Tug Anna Sheridan Corporation and The
Tug Anna Sheridan, Impleaded
Cross-Respondents.

SAXON STEAMSHIP COMPANY, Inc.,
Owner of the S.S. Saxon, Libellant,

v.

THE Tug ANNA SHERIDAN, her en-
gines, boilers, tackle, apparel, etc., and
Tug Anna Sheridan Corporation, Owner
and Operator of the Tug Anna Sheri-
dan, Respondent.

BARGE LAKE FARGE CORPORATION,
Owner of the Barge T. J. Sheridan,
Libellant,

v.

THE Tug ANNA SHERIDAN and Tug
Anna Sheridan Corporation,
Respondents
and
The Steamship Saxon, Saxon Steamship
Company, Inc., and Isbrandtsen Com-
pany, Inc., Impleaded Respondents.

Nos. 253 of 1955, 167 of 1956,
367 of 1956, Admiralty.

United States District Court
E. D. Pennsylvania.
March 30, 1960.

James B. Doak, LaBrum & Doak, Philadelphia, Pa., for libellant.

Harrison G. Kildare, Rawle & Henderson, Philadelphia, Pa., for Saxon S. S. Corp.

George E. Beechwood, Beechwood & Lovitt, Philadelphia, Pa., for The Tug Anna Sheridan and Tug Anna Sheridan Corp.

GRIM, District Judge.

On November 9, 1954, there was a collision between a ship and a large barge (which looked like a ship and was towed by a tug) in the Delaware River off the northeastern part of Philadelphia, Pennsylvania. Both ship and barge were damaged. There are three resulting suits in admiralty, which have been tried together without a jury, and the matter is now before the court following argument on requests for findings of fact and conclusions of law.

The owner of the barge sued the ship, her owner, and her operator, and the shipowner cross-libeled the barge and her owner. The shipowner also sued the tug and her owner. The owner of the barge also sued the tug and her owner, and they impleaded the ship and her owner and operator.

The collision took place a short distance upstream from the Delair bridge, which carries the tracks of the Pennsylvania Railroad over the river, and at right angles to it, from Philadelphia to Delair, New Jersey. It is a level bridge and was composed of three fixed spans and a 300-foot swing span. Counting from the Pennsylvania side, the swing span was the third of the four spans.

The vertical clearance of the spans above the water varied from 48 to 55 feet, depending on the tide. The bridge was about 40 feet wide. A bridge tender employed by the railroad was stationed in a small tower or cab in the middle of the swing span. He opened and closed the span, which pivoted on a pier in its center. In the open position the swing span was at right angles to the rest of the bridge and allowed ships to pass through channels on either side of the pier on which the span rested. The draw channel, extending several hundred yards above and below the bridge, was 300 feet wide. The amount of navigable water or draw, beside the pier which supported the swing span on the western or Pennsylvania side of the open swing span was 122 feet, and on the New Jersey side 120 feet.

The Koppers Coke pier is on the Pennsylvania side 3,000 to 4,000 feet upriver from the bridge. The tip of the Koppers Coke pier was 3,700 feet from the center of the west draw of the bridge.

Going upstream from Petty's Island (below the bridge) to the Koppers Coke pier, the river describes a rough arc to the left. The deep water channels and ranges in the river, going upstream between these two points, are (1) Fisher Point Range, (2) Fisher Channel, (3) The Draw Channel, through the bridge, and (4) Delair Range north of the bridge. They appear on the charts as a continuous series of straight channels of varying length, each 300 feet wide and each bearing to the left of the channel below it. This situation of changing courses presented some difficulty to a ship going upstream and might tempt a pilot heading in that direction to make things easier for himself by cutting corners at the bridge and taking the left-hand draw.

On the day in question the liberty ship Saxon, in charge of her master and a Delaware River pilot who had boarded her off Greenwich (and who had previously piloted only one ship through the Delair bridge) was proceeding upstream to take on cargo at the Koppers Coke

pier. Being light, the Saxon drew only 6 feet of water forward and 12 feet aft, and her propeller and rudder were half out of the water. Accompanying her upstream to dock her were the tugs Deinlein and Quaker. The Quaker went well ahead of the Saxon and the Deinlein, and arrived at the Koppers Coke pier to inquire at what time the vessel then docked there, the barge T. J. Sheridan, would be leaving. Those in charge of the Saxon knew that there was a vessel at the Koppers Coke pier and that the Saxon was to take her place there. Because of charter and berth instructions the Saxon had to get to the pier on the tide then running. When the Quaker arrived at the pier she was told that the T. J. Sheridan would be leaving the pier at about 1:30 p. m. The Saxon was apprised of this shortly after 1:00 p. m. The weather that day was clear, but not bright, and visibility was good. There was a 15-mile breeze blowing from the north or northwest.

The barge T. J. Sheridan is 318 feet long. She looks like a ship, with a superstructure and funnel high enough to prevent her from passing beneath the spans of the Delair bridge. She cannot pass the bridge unless it is open. She was once a ship. She is a barge because her propulsion machinery has been removed. She is able to steer.

The barge was docked at the pier, facing inshore. The tug Anna Sheridan lay alongside her facing the opposite direction and put a hawser from her stern to the bow of the barge. She also put a bow line to the after part of the barge and a spring line somewhere between. At about 1:30 p. m. the barge cast off from the pier and the tug moved her astern, turning her stern upriver. At about this time the master of the tug blew three blasts on the whistle as a signal to open the bridge. When the barge was partly turned, the tug let go the spring line and bow line and turned downstream, pulling the barge's bow around to follow. Going downstream, with an ebb tide of 1½ to 2 knots, the tug was pulling the barge on a hawser

about 200 feet long at a speed of 2½ to 3 knots over the land. The total distance from the bow of the tug to the stern of the barge was about 600 feet. The tug and tow were in charge of the tug's master, a river pilot.

Since the bridge had not opened, the tug's master again blew three blasts. He was heading so as to take the tug and tow to the Delair Channel and then in the Draw Channel through the west draw of the bridge. As he got to a point 3,000 feet above the bridge he saw the Saxon 3,000 feet below the bridge and heading upstream at about 6 knots. The tug's master blew one blast to signal a port-to-port passing. There was no answer. The tug and tow and the Saxon continued their respective speeds toward the bridge, and the bridge opened. About 1½ to 2 minutes later, when he had gotten within about 2,500 feet of the bridge, the tug's master blew a second one-blast signal. At this time he saw the Saxon in Fisher Channel, about 2,600 feet below the bridge. The signal was not answered, and the tug stopped her engines. When the tug was about 1,350 feet above the bridge the tug's master blew a third one-blast signal. At this point the Saxon was headed for the west draw and about 900 feet below the bridge. This signal was also unanswered either because the Saxon did not hear the three signals or because she ignored them. The tug and tow had headway and were moving downstream on the tide and on their own momentum toward the west draw, toward which the Saxon was heading.

Observing that his signals were not answered, the tug's master then blew a two-blast signal (for a starboard-to-starboard passing) and headed for the east draw of the bridge. This likewise re-maining unanswered, the tug's master blew a second two-blast signal.

The Saxon first saw the barge (but not the tug, the view of which was obscured by the bridge) when the Saxon was two ship's lengths (about 900 feet) below the bridge. At this time the Saxon blew a one-blast signal. The barge disappeared from the Saxon's view behind the bridge as the Saxon continued upstream. When the Saxon was halfway through the bridge (in the west draw) it saw the tug and tow 800 to 1,000 feet dead ahead. Both vessels blew the danger signal. When the stern of the Saxon had cleared the bridge it ordered its engines full astern. This had the effect of slowing the ship's forward motion and turning her to her right. The tug and tow meanwhile continued on a course toward their left for the east draw of the bridge, at an angle of about 50° to the course of the Saxon. The tug, finding itself unable to keep itself and its tow out of the Saxon's way, cut the hawser to the barge and, free of this burden, managed to skitter past the bow of the advancing Saxon, missing it by 20 or 30 feet, and turned to the right. This brought the tug in line with the bridge pier at the east end of the open draw.

The barge, uncontrolled by the tug, continued on its course and rammed into the side of the Saxon at a point about 900 feet above the Delair bridge. It bounced off, hit her again farther astern, and came to rest alongside the west side of the ship, facing upstream.

 The Saxon chose the west draw because it allowed her a longer straight-line course through the bridge (because of the curve of the river) than did the east draw. In taking the west draw she violated the inland narrow channel rule.

"In narrow channels [1] every steam

---

1. A channel 800 to 1,000 feet wide in the Delaware River, just north of the Delaware River [Benjamin Franklin] Bridge, has been held to be a "narrow channel", Tug New York Company v. The Robin Doncaster, D.C.E.D.Pa.1955, 130 F.Supp. 136, affirmed 3d Cir., 1956, 233 F.2d 889. Consequently, a 300-foot channel is a narrow channel. See also Reading Company v. The Blommersdyk, D.C.E.D. Pa.1953, 111 F.Supp. 474 and Petition of Terminal Transport Company, D.C.E.D. Pa.1957, 157 F.Supp. 446.

vessel[2] shall, when it is safe and practicable, keep to that side of the fairway or mid-channel which lies on the starboard side of such vessel." 33 U.S.C.A. § 210.

While there was testimony that vessels moving upstream often use the west draw, there was evidence that it was safe and practicable to use the east draw, and I find specifically that when going upstream it would have been safe and practicable, if somewhat more inconvenient, for the Saxon to have used the east draw. Under the circumstances, and particularly in the light of the fact that the Saxon knew that the tug and tow were about to leave the Koppers Coke pier, the use of the west draw by the Saxon was unjustified and improper.

Proctors for the Saxon have cited United States v. Motor Tanker J. A. Cobb, D.C., 182 F.Supp. 234, 1959 A.M.C. 2277 which held that the narrow channel rule did not apply to the drawbridge of the Central Railroad of New Jersey across Newark Bay, where a tug and tow, approaching in a curved channel, used the left-hand draw, and there was evidence that for 25 years large vessels with tows proceeding in that direction had used the left-hand draw. On several counts, however, the Cobb case is distinguishable from the case at bar. For one thing, the left-hand draw of the Newark bridge is 216 feet wide, compared with the 134-foot width of the right-hand one, and was wide enough to permit the vessels which collided in that case to pass each other going through.[3] More important, however, is the fact that at the time of the collision the Newark Bay bridge tender opened the left-hand draw and kept the right-hand draw closed, leaving the tug and tow no choice of draws.

■ While proceeding up the wrong side of the channel the Saxon either assumed that there was no danger in the area obscured by the bridge or was completely indifferent to what might be there in much the same way as a motorist might assume that there is no traffic approaching him at a blind intersection. Either of these is negligence.

■ When the Saxon first saw or should have seen the barge she had time to stop short of the bridge. Not having an unobstructed view, she should have stopped until she knew whether the barge was moving and, if so, to what point. Even as she was clearing the bridge, having had the tug's two-blast signal, she could have gone to her left into deep water above the bridge and avoided the collision. Instead, by reversing her engines, she turned to the right and rendered a collision inevitable.

■ The Saxon thus was at fault (1) in failing to be alert and to hear and answer the tug's signals, (2) in using the west draw, (3) in assuming there was no danger in a place her view of which was obscured, (4) in failing to stop when she first saw the barge, and (5) in taking action that turned her to her right beyond the bridge.

■ The Saxon contends that she and the tug-and-tow were on crossing courses and that she was, as the privileged vessel in that situation, not only entitled but in duty bound to hold her course and speed under the Inland Rule which provides:

"When two steam vessels are crossing, so as to involve risk of collision, the vessel which has the other on her own starboard side shall keep out of the way of the other." 33 U.S.C.A. § 204.

This rule has no application to vessels in a narrow river channel, The Victory (The Plymothian), 1897, 168 U.S. 410, 18 S.Ct. 149, 42 L.Ed. 519.

---

2. "The word 'steam vessel' shall include any vessel propelled by machinery." 33 U.S.C.A. § 155.

3. The west draw of the Delair bridge was 122 feet wide. The width of the Saxon was 56 feet 10¾ inches. The width of the T. J. Sheridan was 49.6 feet. The combined width of the vessels was thus about 106½ feet, leaving only 15½ feet for all clearances.

■ The privileged vessel here was the tug with her tow, the tide moving them downstream, since it was easier for the Saxon, moving against the tide, to control her movements, The Galatea, 1875, 92 U.S. 439, 23 L.Ed. 727.

While it is obvious that the Saxon could not safely have stopped or changed course during her passage through the drawbridge and that as she left it she had dead ahead of her and blocking her course the tug and tow 600 feet long, the predicament was one she had made for herself. The difficulty facing the tug's master was that he had no way of knowing, until the very last, that the Saxon, in spite of the tug's signals for a port-to-port passing, was about to violate the narrow channel rule and attempt to take the west draw. In this emergency the tug's master took the only course he could that offered any chance of avoiding a collision: turning left and heading with all possible speed for the east draw. Had he continued on his former course, he would have rammed the Saxon. Had he reversed his engines, the collision would not have been avoided, since this action could not have stopped the barge he was towing. Had he turned to the right, with a heavy barge over 300 feet long, having momentum downstream, he ran the risk of having the barge run into the bridge or go aground.

■ It is contended on behalf of the Saxon that the tug was at fault in failing to blow the danger signal when her previous signals had gone unacknowledged. The sounding of the danger signal at that time, however, would not have prevented the collision, and furthermore the tug was entitled to assume that the Saxon would take the east draw. That course was not only the course which would have been prudent if there were no traffic above the bridge,[4] but was the course the Saxon should have taken in the light of her knowledge that the tug and tow would be in the river and near the bridge at about that time.

■ It is also contended on behalf of the Saxon that the tow line was too long and that, therefore, the tug was at fault in failing to "bunch" her tow in conformity with this provision of the Inspectors' Rules:

"Tows must be bunched above the mouth of the Schuylkill River, Pa." 33 C.F.R. § 84.4(b).

While there is a dispute as to whether this Rule applies to the Delaware River or to the Schuylkill, this question need not be decided, since it is clear both from the testimony and from a construction of the Rule that the term "bunching" applies only to the towing of two or more barges by a tug or other type of vessel.

The tug Anna Sheridan, therefore, was free of fault.

In the brief time in which the barge had an opportunity to maneuver on its own after the towline went slack—and there is no evidence that the barge had any advance notice that the towline would be cut—the barge might have thrown her rudder to the left or right. This might have changed the points of impact with the Saxon, but would not have prevented the collision. I find the barge T. J. Sheridan, therefore, free of fault.

Decrees will be entered accordingly. The question of damages has been deferred, by stipulation, pending the determination of liability. The facts and law stated in this opinion constitute the court's findings of fact and conclusions of law.

---

4. It was a risk for the Saxon to take the west draw unless she had positive knowledge that there was no traffic above the bridge which might possibly take the west draw.